Kennedy Nameplate Company, a corporation v. Commissioner.
Kennedy Nameplate Co. v. Commissioner
Docket No. 6695.
United States Tax Court
1947 Tax Ct. Memo LEXIS 198; 6 T.C.M. (CCH) 622; T.C.M. (RIA) 47150; May 29, 1947
*198 1. Petitioner, a corporation, was organized in 1923 by two individuals, each of whom, except for one qualified share, acquired 50 per cent of petitioner's capital stock. These individuals were elected officers of petitioner and have continued as such to and through the taxable years ended June 30, 1941 and 1942. Each officer devoted all of his time to petitioner's business. In 1940 petitioner increased the salaries of each officer up to $12,000 per annum, which was a substantial increase over previous years. During each taxable year petitioner paid each officer $12,000 as a regular salary, $5,000 as a bonus and approximately $900 as proceeds from the sale of scrap. Petitioner declared or paid no dividends, as such, since the fiscal year ended June 30, 1938. Held, petitioner is not entitled to deduct under section 23 (a) (1) (A) I.R.C., as reasonable compensation for services rendered by its two officers any amount in excess of the regular salaries paid each year in the total amount of $24,000 and proceeds from the scrap sales; held, further, the payments of the bonuses were in the nature of dividend distributions on stock and not deductible by petitioner as *199 ordinary and necessary expenses under section 23 (a) (1) (A). 2. Petitioner at the time of incorporation in 1923 took over a name plate business then being conducted by a partnership. During the taxable years its business included the production of many items in addition to name plates which were sold largely to the airplane industry. During the taxable years petitioner was badly in need of a new building, a new press and other equipment and adopted a policy of accumulating its earnings for that purpose. Held, that during the taxable years ended June 30, 1941 and 1942, petitioner was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being distributed to its stockholders and it is not liable for the surtax imposed by section 102 of the Internal Revenue Code. Preston D. Orem, Esq., and C. Earle Memory, C.P.A., 416 W. 8th St., Los Angeles 14, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion *200 The respondent determined deficiencies for the taxable years ended June 30, 1941 and June 30, 1942, as follows: Declared
Value Excess
Excess
Year
Income Tax
Profits Tax
Profits Tax
1941
$ 9,017.79
$1,567.27
$2,394.01
1942
10,782.80
1,546.56
4,790.16
*201 In a statement attached to the deficiency notice the respondent. among other things, advised petitioner as follows: "It is held that the sums paid to your officers as alleged compensation, and deducted from gross income in computing your taxable net income, for the taxable years ended June 30, 1941 and 1942 exceed reasonable allowances for services rendered in such years within the purview of section 23 of the Internal Revenue Code to the following extent:" Taxable Year Ended June 30, 1941
Item of Alleged
J. W.
W. J.
Compensation
Hayek
Kennedy
Bonus
$5,000.00
$5,000.00
Proceeds from sale of scrap
material retained by officer
936.58
936.58
Amounts deemed excessive
$5,936.58
$5,936.58
Taxable Year Ended June 30, 1942
Bonus
$5,000.00
$5,000.00
Proceeds from sales of scrap
material retained by officer
858.18
858.18
Amounts deemed excessive
$5,858.18
$5,858.18
"It is held that for each of the taxable years ended June 30, 1941 and 1942, you were availed of for the purpose of preventing the imposition of surtax upon your shareholders through the medium of permitting your earnings and/or profits to accumulate *202 beyond the reasonable needs of your business instead of being divided or distributed. Accordingly, surtax is imposed upon you for each of said taxable years ended June 30, 1941 and June 30, 1942 under the provisions of section 102 of the Internal Revenue Code." Petitioner by appropriate assignments of error contests all of the above-mentioned adjustments and holdings of the respondent. In determining the average base period net income for each of the taxable years here involved the respondent eliminated in each year the amount of $500 from the average base period net income as disclosed by petitioner's returns. Petitioner does not contest these eliminations. Findings of Fact Petitioner is a corporation. It was incorporated under the laws of the State of California on August 19, 1923, and has its principal office and place of business in the City of Los Angeles. It filed its corporation income and excess profits tax returns for the fiscal years ended June 30, 1941 and June 30, 1942 with the collector for the sixth collection district at Los Angeles. Joseph W. Hayek has been in the name plate business since 1907. From 1907 to 1917 he either managed name *203 plate companies or the name plate departments of various companies. In 1917 he started a name plate business in Minneapolis, Minnesota under the name of Hayek Nameplate & Novelty Company. In 1921 he sold this business to William James Kennedy and Kennedy's uncle. Kennedy and his uncle moved the business to Los Angeles, California and began to operate it as a partnership under the name of Kennedy Nameplate Company. Hayek originally became an employee of the partnership and had charge of the production end of the business. Soon thereafter Kennedy's uncle sold his 50 per cent interest in the partnership to Hayek and in 1923 Hayek and Kennedy organized the petitioner herein. The business of the partnership was transferred to petitioner in exchange for the latter's stock. From the time of organization to and through the taxable years here involved Hayek has been the president and a director of petitioner and Kennedy has been the secretary-treasurer and a director. Both men have devoted their entire time to petitioner's business and have engaged in no outside business activities. At the time petitioner was organized it issued 1,251 shares of its stock to Hayek, 1,251 shares to Kennedy, *204 and 1 share to a Mr. Frank who became a director along with Hayek and Kennedy. Petitioner had only three directors. Frank was later succeeded by D. R. Koelling who then became the third director. The stock had a par value of $10 per share. During the taxable years here in question the stock that was issued to Hayek was owned by him as his separate property and the stock that was issued to Kennedy was either owned by him as his separate property or by him and his wife, Alice L. Kennedy, as community property. Kennedy was employed by various companies in New York City, Chicago, and in South America from 1912 to 1921 when he first engaged in the name plate business. He had had quite extensive experience as an executive and manager and in sales promotion both in the United States and in South America. From the time petitioner was organized to and through the taxable years here involved Hayek and Kennedy divided the important managerial functions of petitioner's business between them. Hayek was in complete charge of production, supervising the work of men employed in several different trades including art, die making, engraving, photography, etching, plating, lithography, decalcomania *205 manufacture and punch press operations. He also employed a portion of the technical personnel. He perfected many new processes and techniques including a new method for camera work, the elimination of certain etching and lithographic operations, die making improvements, new engraving methods, new chemical solutions and new uses for chemical solutions, new processes for plastics and fibre, fluorescent plates and many others. He and Kennedy together devised a new type of conveyor to operate under a bank of infra red light which has been quite successful. Kennedy was in complete charge of all departments and activities of petitioner except production, including sales, advertising, price figuring, employment of a portion of the technical personnel, collections, purchases, finances and also keeping in constant touch with new technological developments and processes. During the taxable years ended June 30, 1941 and June 30, 1942, Hayek worked from 65 to 75 hours per week as compared with about 45 hours in 1939. Many times he worked on Sunday during the war and more than once he was required to work all night on important war jobs. Kennedy worked about 54 hours per week during the taxable *206 years as compared with about 45 hours per week during 1939 and 1940. The business of petitioner during the years 1941 and 1942 included the production of many items in addition to name plates, including scales, dials, instruction and designation plates, luminous, fluorescent and phosphorescent plates and other articles of similar nature which were sold largely to the airplane industry. It was necessary to substitute plastics and fibres for metals in manufacturing many products because of the shortage of metals and the necessity for conserving strategic materials. The business of the company during these years also involved the use of radium and black light. Many problems arose due to the fumes caused by the use of certain materials, allergies and radioactivity. Government inspection during the war was very rigid, requiring greater accuracy in production than in prior years. The by-laws of petitioner empowered the board of directors to appoint and remove all officers of the company, prescribe their duties and fix their compensation. The minutes of the regular meeting of the board of directors of petitioner held on April 30, 1940 provide in part as follows: "On motion of Jos. *207 W. Hayek, seconded by D. R. Koelling, it was voted to increase the salary of W. J. Kennedy, to $12,000 per year, retroactive to July 1st, 1939. "W. J. Kennedy then relinquished the chair to Jos. W. Hayek, and moved, seconded by D. R. Koelling, that the salary of Jos. W. Hayek be increased to $12,000 per year, retroactive to July 1st, 1939." The minutes of the regular meeting of the board of directors of petitioner held on June 11, 1941 provide in part as follows: "On motion of W. J. KENNEDY, seconded by D. R. Koelling, a bonus of $5,000. was voted to JOS. W. HAYEK AND W. J. KENNEDY." Petitioner's net sales, officers' compensation (Hayek and Kennedy only), net income before Federal taxes on income, Federal taxes on income, and net profits for the fiscal years ended June 30, 1936 to June 30, 1942, inclusive, were as follows: Net Income
Year Ended
Net
Officers'
before Fed-
Federal Taxes
Net
June 30
Sales
Compensation
eral Taxes
on Income
Profit
1936
$ 82,153.49
$ 6,542.00
$16,430.61
$ 2,925.79
$13,504.82
1937
98,354.42
15,000.00
13,870.53
2,961.67
10,908.86
1938
109,464.23
15,322.40
6,387.47
1,526.50
4,860.97
1939
109,966.49
15,183.30
10,164.23
1,347.99
8,816.24
1940
151,446.43
24,194.80
15,862.53
2,145.75
13,716.78
1941
256,451.30
34,000.00
46,942.07
16,709.61
30,232.46
1942
363,912.88
34,000.00
91,747.72
50,597.47
41,150.25
*208 Beginning in 1931 petitioner began paying bonuses to certain of its employees. During the taxable years such bonuses approximated $12,000 to $14,000 per year. During the fiscal years ended June 30, 1937 to June 30, 1942, inclusive, petitioner's employees numbered 39, 36, 37, 53, 73 and 90, respectively. Petitioner accumulated certain scrap from time to time which is the metal that was left over from the various jobs. It is usually referred to as "overs on jobs" and is sold as scrap. The proceeds from the sales of scrap by petitioner amounted to $1,873.16 for the fiscal year ended June 30, 1941 and $1,716.36 for the fiscal year ended June 30, 1942. One-half of these amounts was paid over to Hayek and one-half to Kennedy, who together with their respective wives reported the amounts in their individual income tax returns as income from the sale of scrap. Petitioner did not return any of the proceeds from the sales of scrap as income and neither did it deduct any amount as compensation, or otherwise, on account of the said proceeds that were paid over to Hayek and Kennedy. The proceeds from the sale of scrap was a part of petitioner's gross income and should have been returned by *209 petitioner as such. It is the practice in the name plate industry to permit officers to sell scrap and to regain the proceeds from such sales as a bonus or additional compensation. Everywhere that Hayek ever worked he always got the scrap or a part of the scrap. In 1916, when he was working for a Minneapolis concern, his salary was $4,420 plus all the scrap except the scrap from sterling silver. In 1930 he was offered a position at an annual salary of $12,000 plus 20 per cent of the scrap. During the years 1941 and 1942 there were only two or three firms besides petitioner in the name plate business in the Los Angeles area. The principal competitior of petitioner in the Los Angeles area was Miller Dial & Nameplate Company. During the years 1941 and 1942 Miller Dial & Nameplate Company was a partnership composed of two brothers, Charles W. Miller and John Dawson Miller. The duties of Charles in the partnership were very similar to those of Kennedy in petitioner and the duties of John in the partnership were very similar to those of Hayek in petitioner. The sales of Miller Dial & Nameplate Company for the calendar year 1941 were approximately $156,000 and for the calendar year 1942 *210 they were approximately $338,000. No salaries were paid to the partners in Miller Dial & Nameplate Company for the year 1941; the partners simply made withdrawals as needed. For the year 1942 the salary of Charles was $24,000 and that of John was $18,000. During February or March of the year 1943 the Northern Engraving Company of Racine, Wisconsin offered to purchase a 51 per cent control of the business of petitioner and to retain the services of Hayek and Kennedy for a period of two years. This offer was rejected. Petitioner has declared or paid no dividends, as such, since the fiscal year ended June 30, 1938. A reasonable allowance for salaries or other compensation for personal services actually rendered to petitioner by each of its officers, Hayek and Kennedy, during each of the taxable years ended June 30, 1941 and June 30, 1942 was the basic salary paid to each officer in each year in the respective amount of $12,000 plus the proceeds from the sale of scrap in each of the taxable years paid to these two respective officers. The amounts of $5,000 paid to each officer in the taxable years ended June 30, 1941 and June 30, 1942 were in the nature of dividend distributions *211 on stock. Petitioner's surplus, increase (or decrease) in surplus, working capital and increase (or decrease) in working capital for the years ended June 30, 1936 to March 31, 1946, inclusive, were as follows (Note: Decreases are shown in parentheses): Increase
Increase
Year Ended
(or decrease)
Working
(or decrease) in
June 30
Surplus
in surplus
Capital
Working Capital
1936
$ 26,141.88
$35,201.14
1937
32,775.62
$ 6,633.74 41,234.91
$ 6,033.77 1938
30,021.08
(2,754.54)
26,405.09
(14,829.82)
1939
39,333.04
9,311.96 32,425.69
6,020.60 1940
42,183.61
2,850.57 36,864.01
4,438.32 1941
72,423.25
30,239.64 50,740.22
10,876.21 1942
114,185.01
41,761.76 75,153.36
24,413.14 1943
135,056.32
20,871.31 69,610.34
(1,543.02)
1944
151,981.40
16,925.08 89,518.16
18,907.82 1945
162,000.47
10,019.07 108,910.14
16,391.98 1946 (9 months)
147,073.45
(14,927.02)
92,818.75
(13,091.39)
Total net increases
$120,931.57 $57,617.61 At all time from June 30, 1936 to March 31, 1946, petitioner's capital stock outstanding was 2,503 shares of the par value of $25,030. During *212 the fiscal years ended June 30, 1936, 1937 and 1938 petitioner declared and paid dividends in the amounts of $1,000.80, $4,311 and $5,006, respectively. Petitioner's comparative balance sheets for the fiscal years ended June 30, 1936 to June 30, 1940, inclusive, are as follows: ASSETS
1936
1937
1938
1939
1940
Cash & Bank Accounts
$20,595.16
$15,311.14
$14,561.85
$15,189.21
$18,305.04
Corporation Stock
10,209.20
Accounts Receivable
13,469.11
13,561.78
11,626.25
11,878.28
17,015.22
Inventories
3,656.07
4,937.87
6,674.30
10,511.31
9,025.46
Plant & Equipment
47,053.77
51,491.79
56,093.81
56,832.32
60,854.20
Prepaid Expenses
308.60
186.20
817.63
543.87
338.91
Deferred Charges & Goodwill
10,866.21
10,866.21
10,866.21
10,866.21
Totals
95,948.92
106,564.19
100,640.05
105,821.20
105,538.83
LIABILITIES & CAPITAL
Current Liabilities
2,519.20
2,785.08
4,930.81
3,805.12
5,335.96
Federal Taxes on Income
1,526.50
1,347.99
2,145.75
Due to Employees
23,652.46
31,240.00
22,141.30
17,017.54
17,017.54
Mortgage Payable
6,000.00
Depreciation Reserves
12,605.38
14,733.49
16,990.36
19,287.51
13,825.97
Capital Stock
25,030.00
25,030.00
25,030.00
25,030.00
25,030.00
Surplus
26,141.88
32,775.62
30,021.08
39,333.04
42,183.61
Totals
95,948.92
106,564.19
100,640.05
105,821.20
105,538.83
*213 Petitioner's comparative balance sheets for the fiscal years ended June 30, 1941 to June 30, 1945, inclusive, are as follows: ASSETS
1941
1942
1943
1944
1945
Cash & Bank Accounts
$33,056.18
$82,825.15
$94,419.12
$59,452.71
$79,396.41
Treasury Notes
25,225.42
25,182.28
Accounts Receivable
28,942.09
33,756.89
31,055.08
21,737.12
17,255.83
Inventories
17,513.90
21,434.86
14,429.96
12,912.47
9,487.66
Plant & Equipment
74,593.98
79,512.41
103,278.34
106,777.58
106,174.01
Prepaid Expenses
451.14
323.82
319.09
286.40
350.66
Boyle Avenue Property
8,126.06
8,008.55
7,891.04
7,773.53
7,656.02
Post War Tax Refunds
3,887.20
4,695.01
4,420.28
Totals
162,683.35
225,861.68
255,279.93
238,860.24
249,923.15
LIABILITIES & CAPITAL
Current Liabilities
12,062.34
12,877.58
17,681.15
16,175.02
21,843.34
Federal Taxes on Income
16,709.61
49,985.96
41,112.67
13,634.54
3,568.70
Notes Payable
3,000.00
3,000.00
10,500.00
Due to Employees
16,997.54
Depreciation Reserves
16,460.61
20,783.13
25,899.69
32,039.28
37,480.64
Capital Stock
25,030.00
25,030.00
25,030.00
25,030.00
25,030.00
Surplus
72,423.25
114,185.01
135,056.32
151,981.40
162,000.47
Totals
162,683.35
225,861.68
225,279.83
238,860.24
249,923.15
*214 Petitioner's balance sheet as of March 31, 1946 is as follows: ASSETS
Cash & Bank Accounts
$ 40,329.53
Treasury Notes
25,026.00
Corporation Stock
9,750.00
Accounts Receivable
16,681.81
Inventories
20,549.81
Plant & Equipment
107,177.14
Prepaid Expenses
1,402.76
Boyle Avenue Property
7,567.91
Post War Tax Refunds
4,420.28
Total
232,905.24
LIABILITIES & CAPITAL
Current Liabilities
19,518.40
Depreciation Reserve
41,283.39
Capital Stock
25,030.00
Surplus
147,073.45
Total
232,905.24
An analysis of petitioner's surplus account from July 1, 1935 to and including March 31, 1946, is as follows (NOTE: All years are fiscal years ending June 30th, except 1946 which is a 9 months' period ending March 31, 1946): Add (or
Add (or
Balance
Deduct) Net
Deduct)
Deduct
Balance
Beginning
Add Profits
Income Tax
Other Ad-
Dividends
End
Year
of Year
for Year
Adjustments
justments
Paid
of Year
1936
$ 10,920.21
$13,504.82
$2,717.65 $1,000.80
$ 26,141.88
1937
26,141.88
10,908.86
35.88 4,311.00
32,775.62
1938
32,775.62
4,860.97
(2,961.67)
$ 352.16 5,006.00
30,021.08
1939
30,021.08
8,816.24
495.72 39,333.04
1940
39,333.04
13,716.78
(10,866.21)
42,183.61
1941
42,183.61
30,232.46
7.18 72,423.25
1942
72,423.25
41,150.25
611.51 114,185.01
1943
114,185.01
21,482.82
(611.51)
135,056.32
1944
135,056.32
16,925.08
151,981.40
1945
151,981.40
10,019.07
162,000.47
1946
162,000.47
(14,927.02)
147,073.45
*215 An analysis of petitioner's plant and equipment account from July 1, 1936 to and including March 31, 1946 indicates that petitioner made the following additions thereto during each year and also wrote off certain assets in amounts as follows: Year Ended
Amounts
June 30
Additions
Written Off
1937
$ 4,438.02
None
1938
4,602.02
None
1939
738.51
None
1940
11,573.14
$ 7,551.26
1941
14,199.03
459.25
1942
5,239.37
320.94
1943
24,199.68
433.75
1944
3,544.49
45.25
1945
680.31
1,283.88
1946 (9 months)
1,003.13
None
70,217.70
10,094.33
Before and during the years 1941 and 1942, the officers of petitioner planned a considerable expansion program for the increase of its plant facilities. These plans included a new modern building with a mezzanine floor designed to fit the manufacturing needs of petitioner which would cost between $150,000 and $250,000. It was estimated by petitioner's officers that this new building would decrease petitioner's costs of manufacture from three to five per cent and provide badly needed space for the restoration of discontinued facilities and the installation of new facilities. Erection of a new building *216 is still planned by petitioner and is essential. During December of 1940, petitioner purchased a site on Boyle Avenue in an industrial section one and one-half miles from its existing plant for $8,126.06. Prior to the purchase, petitioner had investigated the Boyle Avenue property and other properties for the purpose of finding a satisfactory location for a new plant. The Boyle Avenue property was purchased for that purpose. Because building contractors were busy on war contracts in 1941, it proved not practicable to put up a building on Boyle Avenue at that time. Later, two large plants of other companies were erected near the Boyle Avenue site, who employed about 6,500 to 7,000 employees. As this situation resulted in a parking problem and traffic congestion around the Boyle Avenue property it was rendered less suitable for the purpose of the erection of a plant for petitioner, although the property had generally become more valuable. Petitioner leased the Boyle Avenue property to a tenant which lease has now expired and the same tenant is occupying the property on a month-to-month basis. Petitioner is now endeavoring to exchange the Boyle Avenue site for a property more suitable *217 for the fulfillment of its building program. When petitioner moved to its present plant in 1928 the cost of moving its machinery to that plant was from $3,000 to $4,000. Petitioner now has from eight to ten times as much equipment which will have to be moved to its new building. Petitioner has a large lithographic press which it purchased about 1926. The press is a Voss and Lang press which was made in 1874. This press is inadequate, dilapidated and slow. Petitioner is badly in need of a new lithographic press. During 1941 or 1942, Hayek made a trip East and investigated lithographic presses at the plants where they were being manufactured. He recommended the purchase of an R. J. Hoe press at a cost of $35,000 to $55,000 f.o.b. Newark, New Jersey, plus $3,000 to $5,000 for shipping and installation costs. Petitioner still badly needs the Hoe press but the present building is not large enough and there is not adequate space for the Hoe press. During the war, Hoe & Company were only taking Government orders and could not make delivery of a press to petitioner. When petitioner is able to purchase the Hoe press and install it for use, it can take large tin sign orders which cannot *218 be accepted at present because of the inadequate press in use. Petitioner planned in 1941 and 1942 to take out all of its present ovens and replace them with infra red conveyors such as the one invented by petitioner's officers and already in use in 1941. The cost was estimated to be $12,000 to $15,000. It is planned to make these installations as soon as there is room for them. Such installations will materially reduce costs and improve the appearance of the jobs. Petitioner had to tear out its plating department in 1941 because of Government restrictions and because the space occupied by the plating department was required for degreasing of material on Government contracts. Since 1942 petitioner has assembled a nickel plating plant but has to subcontract out all other plating. This causes delays in deliveries and reduces profits. Additional plating facilities are required at present and would cost $15,000 to $20,000. During 1941 and 1942, petitioner planned to obtain a license for color anodizing from the Aluminum Corporation of America at a cost of $5,000 for the license plus $10,000 to $12,000 for the required color anodizing plant consisting of tanks, dynamos, lines, anodes, *219 etc. Due to war requirements, petitioner had no available space for the proposed installation but still contemplates securing the license and putting in the plant as soon as the space is available. This type of facilities is required to keep petitioner's service to its customers complete and continuous. Petitioner also planned during 1941 and 1942 to go further into the field of plastics manufacture, put in an adequate hydraulic press, a good plastic press and other miscellaneous equipment which would cost around $25,000 at first and more later. During 1941 and 1942, petitioner anticipated an eventual cessation of war hostilities and that a reconversion period would follow. Petitioner believed it would lose all of its war customers, and have to find new customers engaged in civilian work, that there would be a loss from its operating during a period from one or two years after the cessation of hostilities, that existing contracts would be cancelled anc cost percentages would be greater during the reconversion period. During the nine months ended March 31, 1946 (the greater portion of that period being after war operations had ceased) petitioner sustained a net loss from operations *220 of $14,927.02 and a decrease in working capital of $13,091.39. Kennedy believes that the reconversion period will last at least one more year after March 31, 1946, during which period it is probable a loss will be sustained. Petitioner's original plant building erected in 1928 and the first addition thereto added in 1929 or 1930 were financed partially by first and second mortgages. When the second mortgage matured in 1931, the mortgagee refused to renew it. Petitioner was unable to refinance the mortgage in Los Angeles and had to refinance it in Chicago in part and by a loan from Hayek in part. There was danger of a foreclosure which would have put petitioner out of business in 1931. After 1931 petitioner adopted a policy of financing all capital additions, such as building sites, additions to buildings, machinery and equipment from its earnings entirely rather than in part through loans. This policy was continued through 1941 and 1942 and up to the present time, petitioner paying cash for all of its capital additions to plant, machinery and equipment, and also planning to finance future contemplated new plant and machinery and equipment additions from its working capital. *221 During the taxable years here involved petitioner was not a mere holding or investment company. Petitioner did not during the taxable years here in question permit its earnings or profits to accumulate beyond the reasonable needs of its business. During the taxable years here involved petitioner was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation through the medium of permitting its earnings or profits to accumulate instead of being divided or distributed. BLACK, Judge: There are three issues involved in this proceeding. The first is whether the respondent erred in disallowing as excessive compensation the bonuses which petitioner paid to its two officers during each of the taxable years here involved. The second is whether the respondent erred in increasing petitioner's income for each of the taxable years by the amount of the proceeds from the sale of scrap which had all been paid over to its two officers and returned by them and their respective wives as taxable income and whether if such proceeds should be taken into petitioner's gross income, petitioner should be allowed as an additional *222 amount for salary deductions, the amounts so paid over to Kennedy and Hayek. The third is whether the respondent erred in determining that petitioner was subject to the surtax on corporations imposed by section 102 of the Internal Revenue Code, as amended, for each of the taxable years ended June 30, 1941 and June 30, 1942. The first two issues are closely related and will be considered together. During each of the taxable years here involved petitioner paid each of its two officers a $5,000 bonus and also paid over to each of its two officers 50 per cent of the proceeds from the sale of scrap. Petitioner did not return any of the proceeds from the sale of scrap as income or deduct any amount on account of the payment of such proceeds to its officers. Hayek and Kennedy and their respective wives each reported one-fourth of such proceeds as income from the sale of scrap. Petitioner in substance now concedes that it should have reported the proceeds from the sale of scrap as its income, but contends that it should also have deducted a like amount as compensation paid to its two officers in addition to the bonuses and regular salaries. During each of the taxable *223 years here involved petitioner deducted $10,000 on account of the bonuses paid and $24,000 on account of the regular salaries paid to each of its two officers. The respondent allowed as deductions the regular salaries; disallowed as deductions the bonuses; included in petitioner's income the proceeds from the sale of scrap; and contends that in no event is petitioner entitled to deductions from gross income as reasonable compensation paid its officers any amount in excess of the regular salaries. The first two issues, therefore, resolve themselves into the single question of whether petitioner is entitled to deduct under section 23 (a) (1) (A) of the Internal Revenue Code, as amended, [1] as "a reasonable allowance for salaries or other compensation for personal services actually rendered" all the amounts paid its two officers during the taxable years here involved. These amounts are as follows: Taxable
Taxable
Year
Year
Ended
Ended
June
June
30, 1941
30, 1942
Regular salary to Hayek
$12,000.00
$12,000.00
Regular salary to Kennedy
12,000.00
12,000.00
Bonus to Hayek
5,000.00
5,000.00
Bonus to Kennedy
5,000.00
5,000.00
Scrap proceeds to Hayek
936.58
858.18
Scrap proceeds to Kennedy
936.58
858.18
Totals
$35,873.16
$35,716.36
*224 The respondent concedes that the regular salaries paid to both Hayek and Kennedy are deductible. He contests only the bonuses and scrap proceeds paid to each officer for each year. He contends that these latter payments were in effect dividends in disguise. Petitioner contends that the total amounts paid represented reasonable compensation for personal services actually rendered. The question presented *225 is one of fact and the burden of proof is upon petitioner. Botany Worsted Mills v. United States, 278 U.S. 282. H. Levine & Bros., Inc., v. Commissioner, 101 Fed. (2d) 391. Section 19.23(a)-6 of Treasury Regulations 103, provides among other things that the test of deductibility in case of compensation payments is whether they are reasonable and are in fact payments purely for services. It uses the following as an illustration: "* * * An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stock holdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock." Like regulations have been held to be fair interpretations of the Congressional intention. H. Levine & Bros., Inc. v. Commissioner, supra. *226 Except for one qualifying share, 50 per cent of petitioner's stock was owned by Hayek and the other 50 per cent was either owned by Kennedy as his separate property or by Kennedy and his wife as community property. Since both Hayek and Kennedy were employed by petitioner and devoted all of their time to petitioner's business, it would not make much difference, if any, to petitioner and its stockholders, except taxwise, whether petitioner distributed its earnings as dividends or in the form of compensation. Under such circumstances close scrutiny is invited. Petitioner has declared or paid no dividends as such since the fiscal year ended June 30, 1938. During that year it paid a dividend of $5,006 which is 20 per cent of its capital stock. During that year it paid its officers a total compensation of $15,322.40 and had a net profit after taxes of $4,860.97. During the next four years petitioner's net profits after taxes increased materially over each preceding year. Notwithstanding these increased profits petitioner did not declare or pay any dividends, as such, but did materially increase the compensation paid its two officers at two different times. The first increase, voted *227 on April 30, 1940 was made retroactive to July 1, 1939, and increased the salary of each officer to $12,000 per year. This was a total increase over the previous year of $9,011.30, or about 36 per cent of the capital stock. The second increase, voted on June 11, 1941, was made retroactive to July 1, 1940, and increased the compensation of each officer by $5,000 per year. This together with the scrap proceeds amounted to a total increase over the previous year of $11,678.36, or about 46 per cent of the capital stock. Of course, if the total payments to Hayek and Kennedy were in fact payments purely for services and were reasonable under all the circumstances, they would be deductible under section 23 (a)(1)(A) of the Code in any event. The Christman Company, 8 T.C. 679, promulgated March 31, 1947. We do not think that under all the circumstances the bonuses paid to Hayek and Kennedy can be considered in fact payments purely for services. We think that under all the circumstances these payments must be regarded in the nature of dividend distributions on stock and we have so found as an ultimate fact in our findings. Petitioner in its briefs contends that considerable *228 weight should be given to the testimony of Charles W. Miller, one of the partners of Miller Dial & Nameplate Company. The latter company was the principal competitor of petitioner in the Los Angeles area. During 1942, this competitor paid its two partners total salaries of $42,000. Miller's testimony can not be given the weight for which petitioner contends for the reason that during the years 1941 and 1942 Miller Dial & Nameplate Company was a partnership and not a corporation. As a partnership it could easily distribute all of its earnings in the form of salaries to its partners without being questioned by the taxing authorities. That is not true in the case of corporations where consideration must be given to whether the payments are in fact purely for services actually rendered and whether they were reasonable under all the circumstances. Cf. Woodcliff Silk Mills, 1 B.T.A. 715. There is no doubt that both Hayek and Kennedy worked long hours during the taxable years here involved and were very competent men in the line of work in which petitioner was engaged. But only about two months prior to the beginning of the taxable years here involved their regular salaries *229 were substantially increased up to $12,000 per annum for each officer. This represented an increase of more than 59 per cent over the preceding year. For the reasons previously given and the fact that no dividends as such were declared since June 30, 1938, we think that $12,000 a year for each officer plus the scrap sales is all that can reasonably be allowed as deductions under section 23 (a)(1)(A), supra, for the taxable years here in question. Cf. Am-Plus Storage Battery Co. v. Commissioner, 35 Fed. (2d) 167; A. David Co. v. Grissom, 64 Fed. (2d) 279; Crescent Bed Co., Inc., v. Commissioner, 133 Fed. (2d) 424; and The Shield Company, Inc., 2 T.C. 763. We hold, therefore, that the respondent's determination as to the bonuses was correct. It follows that during the taxable years here involved petitioner is only entitled to deduct under section 23 (a)(1)(A), supra, the total amounts of $24,000 for each year plus the payments from the scrap sales as reasonable compensation paid its officers Hayek and Kennedy. We will now consider the third issue as previously stated. The material provisions of section 102, except for the rates *230 of tax, are identical for each of the taxable years ended June 30, 1941 and 1942, and are in the margin. [2]
*231 The respondent does not contend that petitioner was "formed" for the purpose of avoiding surtax upon shareholders. Neither does he contend that during the taxable years petitioner was "a mere holding or investment company" as that term is used in section 102 (b). It is clear, of course, that petitioner was not a mere holding or investment company and that it was not formed for the interdicted purpose. The issue is therefore narrowed to whether petitioner was "availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed * * *." The respondent determined and he contends that during the taxable years here in question petitioner permitted its earnings or profits "to accumulate beyond the reasonable needs of the business" as that phrase is used in section 102 (c). By virtue of section 102 (c), the accumulation of earnings or profits beyond the reasonable needs is determinative of a purpose to prevent the imposition of the surtax upon the shareholders, unless the petitioner by a clear preponderance of evidence proves to the contrary. See Whitney Chain & Mfg. Co., 3 T.C. 1109, *232 affirmed 149 Fed. (2d) 936. The determination of whether petitioner during the taxable years in question permitted its earnings or profits "to accumlate beyond the reasonable needs of the business" or whether petitioner was "availed of" for the interdicted or condemned purpose are questions of fact to be determined from all of the evidence. See sections 19.102-2 and 19.102-3 of Treasury Regulations 103. See also Helvering v. National Grocery Co., 304 U.S. 282; Helvering v. Chicago Stock Yards Co., 318 U.S. 693; Cecil B. DeMille Productions, Inc., 31 B.T.A. 1161, affirmed 90 Fed. (2d) 12, certiorari denied 302 U.S. 713. We think petitioner has met its burden of proof. Upon the evidence received at the hearing we have found as ultimate facts that during the taxable years in question petitioner did not permit its earnings or profits to accumulate beyond the reasonable needs of its business and that it was not availed of for the purpose of avoiding surtax upon its shareholders. The evidentiary facts in support of these ultimate findings are set out in considerable detail in our findings and need not be repeated *233 here except in very brief summary form. After Kennedy's experience upon behalf of petitioner in 1931 of attempting to refinance a second mortgage, petitioner adopted a policy of financing all capital additions from its earnings rather than in part through loans. In this connection Kennedy testified that in 1931 he tried everybody in Los Angeles whom he thought would loan money; that he was unable to find anyone in Los Angeles who would take the mortgage; that he finally was able to find a bank in Chicago who advanced a part ($6,000) of the funds necessary to refinance the mortgage; that Hayek put up the balance that was necessary; and that "I spent the worst six months, I think, that I ever spent in my life at that time, and we had to make it up between us or lose the business. It was really terrific. I determined I would never get myself into debt to a bank again." The statute does not prohibit such a policy as petitioner adopted after its 1931 experience. It is only when the accumulation goes "beyond the reasonable needs of the business" that the statute is apt to apply. See General Smelting Co., 4 T.C. 313, 323. In the instant proceeding both Hayek and Kennedy *234 testified at considerable length as to certain needs of the business for which petitioner was accumulating its earnings. These may be summarized in Minimum amounts as follows: New building
$150,000
Moving to new building
24,000
New lithographic press
38,000
Installation of infra red conveyors
12,000
Additional plating facilities
15,000
Anodizing license and equipment
15,000
Plastic and other equipment
25,000
Total
$279,000
We are convinced from the evidence that the above business needs as testified to by Hayek and Kennedy are all reasonable requirements for the continued successful operations of petitioner's business. As was said in William C. deMille Productions, Inc., 30 B.T.A. 826, "it must be assumed that any business shall have the right to grow." During the taxable years petitioner purchased the Boyle Avenue property at a cost of about $8,000 as the intended site for its new building and spent $19,438.40 for additions to its plant and equipment. For the reasons stated in our findings this site proved not suitable as a site for petitioner's new building and petitioner is now endeavoring to exchange it for a property more adaptable *235 to petitioner's needs. A great many of these necessities as testified to by Hayek and Kennedy cannot be installed until the new building is erected. In view of all the facts we do not think the accumulations during the taxable years were unreasonable. During the two taxable years here involved petitioner's surplus increased from $42,183.61 to $114,185.01, an increase of $72,001.40. This increase is made up of earnings for 1941 of $30,232.46; earnings for 1942 of $41,150.25; and miscellaneous credits to surplus of $618.69. These earnings for 1941 and 1942, totalling $71,382.71, are the earnings after deducting Federal taxes already paid of $67,307.08. The latter amount does not include the deficiencies here in question totalling $30,098.59. In view of our holding on the issue of the reasonableness of salaries, a substantial portion of these total deficiencies plus interest will have to be paid. After considering all the evidence we think it is apparent that petitioner's accumulations at the end of the taxable year 1942 fell short of being sufficient to meet the reasonable needs of petitioner's business, present and prospective within the reasonable future. In his brief the respondent *236 makes reference to the needs testified to by petitioner's officers in the total minimum amount of $279,000 and says: "* * * Respondent recognizes that this Court and the appellate courts have held that a corporation may accumulate gains and profits consonant with the needs of the business without being liable for the tax in question, nevertheless, he submits that considering all of the evidence of record the petitioner has failed to justify the accumulation herein involved. With respect to the expenditure of $150,000 for a new building the Court's attention is directed to the fact that the petitioner gives no consideration at all to the use of credit or to the fact that there would be some realization from the sale of its present plant which was carried out on the books at a value of $58,000 and in all probability had a market value considerably in excess of this figure." We do not understand that section 102 of the Internal Revenue Code and the regulations promulgated thereunder prevent a taxpayer corporation from making a reasonable accumulation of its earnings to finance expansion and modernization programs out of its own funds rather than to resort to *237 borrowing for that purpose. General Smelting Co., supra. As to whether there would be some realization from the sale of petitioner's present plant, the answer is that of course there would be. The $58,000 figure mentioned by the respondent (which is cost of $79,512.41 less depreciation of $20,783.13) is a part of petitioner's accumulated surplus of $114,185.01. If that amount were not carried as an asset, petitioner's surplus would be that much less. The respondent contends that a strong factor in support of his determination is the fact that petitioner has declared or paid no dividend, as such, since the fiscal year ended June 30, 1938. Our holding on the first issue, however, mitigates considerably the force of this contention. Under the first issue we held that the total amounts paid to petitioner's officers as bonuses during the taxable years were not deductible by petitioner as ordinary and necessary expenses in the form of compensation but were in the nature of dividend distributions on stock. [3] We think under all the circumstances these amounts must be treated as dividends. Therefore, it is not correct to consider this proceeding as one in which no dividends *238 were paid. We, therefore, sustain the petitioner on this issue. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
2. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. (a) Imposition of Tax. - There shall be levied, collected and paid for each taxable year (in addition to other taxes imposed by this chapter) upon the net income of every corporation (other than a personal holding company as defined in section 501 or a foreign personal holding company as defined in Supplement P) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following: * * *
(b) Prima Facie Evidence. - The fact that any corporation is a mere holding or investment company shall be prima facie evidence of a purpose to avoid surtax upon shareholders. (c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩
3. See section 19.23(a)-7 of Treasury Regulations↩ 103, which among other things provides: "Thus, in the case of excessive payments by corporations, if such payments correspond or bear a close relationship to stoc k holdings, and are found to be a distribution of earnings or profits, the excessive payments will be treated as a dividend."