THE CHRISTMAN COMPANY, A MICHIGAN CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9284. Promulgated March 31, 1947.

*Clayton F. Jennings, Esq.*, and *Clarence A. Bradford, Esq.*, for the petitioner.

*Clarence E. Price, Esq.*, for the respondent.

## OPINION.

Murdock, *Judge*: The issue in regard to equity invested capital requires a brief explanation. The Commissioner allowed a larger excess profits credit for each of the years here involved than the petitioner claimed on its returns. He recognized that the petitioner had made an error in considering that outstanding stock went into equity invested capital at $5 per share instead of at $10, the amount originally paid for each share. The question here is, what was the amount of the petitioner's equity invested capital under section 718, of the Internal Revenue Code.[1] The respondent contends that his determination was correct. The petitioner contends that $124,000 was paid in cash for shares and $124,000 was paid in property for shares when it was organized, its equity invested capital includes both amounts, and no adjustment is to be made for stock later reacquired and held as treasury stock. The respondent concedes that $124,000 in cash was paid in for 12,400 shares at the incorporation of the petitioner, but he argues that the property paid in for another 12,400 shares was not worth $124,000 at that time but was worth only $63,239.44.

Some property was paid in for 12,400 shares. It is to be included in equity invested capital at its basis for loss, regardless of its value. Cf. *Ralphs-Pugh Co.*, 7 T. C. 325. Its basis was its cost. It was acquired by issuing shares and its cost was the then value of those shares. The evidence indicates that the shares were worth $10 each. That

---

[1] SEC. 718. EQUITY INVESTED CAPITAL.

(a) Definition.—The equity invested capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following amounts, reduced as provided in subsection (b)—

(1) Money Paid In.—Money previously paid in for stock, * * *

(2) Property Paid In.—Property (other than money) previously paid in (regardless of the time paid in) for stock * * *. Such property shall be included in an amount equal to its basis (unadjusted) for determining loss upon sale or exchange. * * *

* * * * * * *

(4) Earnings and Profits at Beginning of Year.—The accumulated earnings and profits as of the beginning of such taxable year.

was the amount paid in cash for 12,400 shares and the property paid in was worth $124,000. The figure of $60,760.56, by which the Commissioner would reduce the $124,000 claimed on account of property paid in for shares, was an amount later owed the petitioner by Indiana, representing profits of the petitioner for 1927 improperly accounted for as belonging to Indiana. It did not serve to reduce the cost of the property paid in for shares. Thus, the computation of equity invested capital begins with $248,000.

The only remaining question on the first issue is whether the $248,000 should be reduced by $140,960, the amount later paid out by the petitioner in reacquiring 14,096 shares of the 24,800 originally issued. The statute is silent on this point. Regulations 112 provide in section 35.718–5 in part as follows:

SEC. 35.718–5 DETERMINATION OF DAILY EQUITY INVESTED CAPITAL—REDUCTIONS BY DISTRIBUTIONS.— * * *

\* \* \* \* \* \* \*

The purchase by a corporation of its own stock for investment does not of itself result in a reduction of invested capital. But see section 35.720–1 relative to inadmissible assets. If, however, the corporation subsequently cancels such stock, invested capital is reduced, beginning with the day following such cancellation, by so much of the adjusted basis of such stock in the hands of the corporation as is not properly chargeable to earnings and profits of the taxable year. If stock is purchased for retirement, there is a distribution on the date of purchase of the amount paid therefor and the invested capital is reduced by the amount thereof not properly chargeable to earnings and profits of the taxable year.

Neither party questions the propriety of that regulation or its application here. We shall assume, for the purpose of this case, that it is a proper regulation and that the remaining question is the one which the parties have argued, i. e., Was the stock reacquired for investment, or was it canceled or purchased for retirement, so that there was a distribution of a part of the capital theretofore invested in the business?

The first reacquisition of shares took place on March 8, 1932. Conrad and Robert, two of the three managing stockholders, had become indebted to the petitioner and desired to cancel that debt by surrendering stock to the petitioner. Ketterman, the only other managing stockholder, surrendered a like number of shares for cash in order to maintain equality among the three. Another stockholder was also indebted to the petitioner and it surrendered shares at that same time in cancellation of all but a small part of its debt. These shares represented almost one-fourth of the outstanding shares.

The remaining 8,446 shares were apparently reacquired in the summer of 1939. The books of the petitioner had been kept for a while with those of Indiana, and profits of the petitioner for 1927 were recorded, falsely, as if they belonged to Indiana. The reacquisition of the 8,446 shares was partly for the purpose of canceling the debt which originated in that falsification of accounts. It may have ter-

minated the stockholdings of the Indiana group, since that group originally acquired only 12,400 shares and thereafter surrendered 12,446 shares (4,000 on March 8, 1932, and 8,446 on July 31, 1939). Over one-half of the original issue had thus far been surrendered. There is no evidence of an intention on the part of the petitioner at March 8, 1932, or at July 31, 1939, to reissue or resell any of the reacquired shares immediately at any future time, or under any plan then in existence. The number of shares involved and the circumstances of the reacquisitions indicate, rather, that there was no intention to reissue or resell any of those shares. Certainly none of the three managing stockholders were to acquire any shares which would disturb the carefully preserved equality of their holdings. The capital represented by the retired shares was apparently not needed. That represented by the 8,446 shares had never been used and that represented by the 5,650 had not been used in the business at least since 1932.

Reference to the cancellations of the old certificates and the purported issuance of new certificates in the name of the petitioner has been avoided intentionally thus far in this discussion. The record on this point is unsatisfactory and the fault lies squarely upon the petitioner. The matter was brought to the attention of its counsel during the course of the hearing and full opportunity to clarify it was available. The petitioner must stand the consequences of any deficiency in the proof.

The 1,650 shares surrendered by Conrad, Robert, and Ketterman on March 8, 1932, were reissued in the name of the petitioner by means of certificate 34, dated December 31, 1932. The 4,000 shares also surrendered on March 8, 1932, were reissued in the name of the petitioner by means of certificate 35, dated February 1, 1932. That date was more than a month prior to the date upon which the resolution was adopted and the 4,000 shares were surrendered. Those two certificates were destroyed by perforation at some time not disclosed by this record.

8,446 shares were surrendered on or about July 31, 1939. Certificate No. 51. for 8,046 shares, was issued in the name of the petitioner. It was dated July 31, 1939, and was for class A stock. Another, No. 70, also dated July 31, 1939, for 400 shares "without par value," was issued in the name of "The Christman Co." although that did not become the name of the petitioner until April 30, 1940. Certificate 71, for 8,046 shares "without par value," was issued in the name of "The Christman Co." It bears the date July 31, 1939, although the name was not changed until April 30, 1940. Certificates 70 and 71 were perforated and certificate 3 was issued for 400 shares and certificate 4 for 8,046, each in the new name of the petitioner. The stubs for 3 and 4 bear the date of July 31, 1939, crossed off with an ink line

and the date of June 6, 1945, written above the earlier date. These irregularities may not be overlooked. They must justify the suspicion that the stock records are not genuine, but were prepared to supply evidence for this case. However, it is not necessary to reach that conclusion in deciding this issue. Suffice to say that the certificates and the stock book do not satisfactorily prove when the certificates in the name of the petitioner were issued. Furthermore, the books of account do not show the existence of any treasury stock at any time up through the taxable years.

The petitioner has failed to prove that it reacquired the 14,096 shares for investment and to negative the Commissioner's determination. It has failed to show that any of the reacquired shares were still a part of equity invested capital within Regulations 112, section 35.718–5. The reacquisition of each share had the effect of distributing $10 of capital, the payment-out of what had originally been paid in, and there would be no sound reason for regarding that money, no longer at risk in the business, as a part of equity invested capital. Cf. *West Construction Co.*, 7 T. C. 974; *David Bruckheimer*, 46 B. T. A. 234, 239. The source of the funds used to retire the shares is immaterial for present purposes. The effect of such a retirement could not be affected by any bookkeeping or "earmarking" of the funds (as between earnings and capital) used to retire the shares. These retirements are chargeable against capital and not to earnings. However, the use of accumulated earnings would likewise reduce equity invested capital. See section 718 (a) (4).

The provisions of section 720 and of Regulations 112, section 35.720–1, relating to inadmissible assets, have been considered, but they do not complicate the present issue. The stock presently under consideration was not an asset of the petitioner during the taxable years (*Borg* v. *International Silver Co.*, 11 Fed. (2d) 147; *David Bruckheimer*, *supra*), and is not within section 720.

The second issue is decided for the petitioner upon the evidence. The three officers, parts of whose salaries have been disallowed, were the managers and operators of the business. They were responsible for its success. They, with other employees, had taken cuts in 1940, with the understanding that increases would follow if earnings permitted. They had earned larger amounts in prior years than their salaries for 1941 and 1942, except that Robert's salary for 1942 was somewhat larger than that for his best prior year. The salaries were not dividends in disguise, but were earned by the services performed. They were duly authorized. The evidence on this point fairly preponderates in favor of the petitioner.

*Decision will be entered under Rule 50.*