Italian American Grocery Co., Inc. v. Commissioner.
Italian American Grocery Co. v. Commissioner
Docket No. 6997.
United States Tax Court
1947 Tax Ct. Memo LEXIS 176; 6 T.C.M. (CCH) 704; T.C.M. (RIA) 47175; June 23, 1947
*176 Petitioner, a corporation, was organized in 1933 to take over the grocery business of three equal partners. Shortly thereafter the business was expanded to include a restaurant which then became the main part of the business. In 1937 one of the three stockholders died and the two remaining stockholders each acquired one-half of his interest in petitioner from his estate. Thereafter, these two remaining stockholders each owned 50 per cent of petitioner's stock and did all of the managing of petitioner's business. In 1936 petitioner adopted a contingent bonus plan which was modified slightly from time to time. In substance this plan provided first for a determination of a preliminary net income before bonuses and taxes. It then provided that of this preliminary net income $25 per share of capital stock should be reserved for dividends and that one-half of the balance, if any, should be equally distributed to the officers as bonuses. During the taxable years 1942 and 1943 and for three years prior thereto each officer was paid a regular annual salary of $12,000. During the taxable years the total bonuses paid by petitioner to its two officers amounted to $13,892.75 and $53,084.43, respectively. *177 The respondent allowed petitioner to deduct as reasonable compensation the total regular salaries paid each year of $24,000 but not any of the bonuses. Held, petitioner is entitled to deduct as reasonable compensation paid its two officers, in addition to the regular salary, a total of $8,000 of the bonuses paid for 1942 and a total of $16,000 of the bonuses paid for 1943. Arthur McGregor, Esq., A. Calder Mackay, Esq., 728 Pacific Mutual Bldg., Los Angeles, Calif., and Charles J. Higson, Esq., for the petitioner. Earl C. Crouter, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies for the taxable years ended December 31, 1942 and December 31, 1943, as follows: Declared Value
Income
Excess-
Excess-
Year
Tax
Profits Tax
Profits Tax
1942
$567.06
$1,285.97
$ 9,306.61
1943
6,932.67
41,050.42
*178 For the year 1943 the respondent determined an overassessment of income tax in the amount of $42.74. In the statement attached to the deficiency notice the respondent adjusted petitioner's net income for the years 1942 and 1943 as disclosed by its returns by adding thereto as "Compensation of officers disallowed" the amount of $13,892.75 for the year 1942 and $53,084.43 for the year 1943. His explanation of the adjustment for 1942 is in the margin. [1] The respondent made a similar explanation for the year 1943. For that year the amount claimed as compensation for each officer (except for the difference of one cent) was $38,542.22; the amount determined by the respondent as reasonable for each officer was $12,000; and the amount determined by the respondent as excessive for each officer (except for the difference of one cent) was $26,542.22. *179 Petitioner, by appropriate assignments of error, contests the above disallowances of $13,892.75 and $53,084.43 claimed by petitioner as a part of the compensation paid its officers during the taxable years 1942 and 1943, respectively. This is the only issue remaining for our determination and decision. Petitioner had also assigned another error relating to an unused excess profits credit adjustment for 1942 in the amount of $556.47 which it waived at the hearing. In the statement attached to the deficiency notice the respondent also made some minor adjustments which are not contested. Findings of Fact Some of the facts are contained in a stipulation of facts which we incorporate herein by reference. Petitioner is a corporation organized on April 14, 1933 under the laws of the State of California, with its principal place of business in Los Angeles, California. It filed its income and declared value excess-profits tax return and excess profits tax return for the calendar years 1942 and 1943 with the collector for the sixth district of California in Los Angeles. Petitioner keeps its books and files its returns of income on the accrual basis. During 1942 and 1943 petitioner *180 had two managing officers, Joe Vivalda and John Gadeschi. The former was president and the latter was secretary-treasurer. The business of petitioner was originated by these two officers and one Matt Borgogno in 1923. At that time they formed a partnership to carry on a grocery business under the name of Carolina Grocery Company, the name later being changed to Italian-American Grocery Company. Petitioner was organized in 1933 to take over the grocery business, and shortly thereafter the business was expanded to include a restaurant. The combined business became known as "Little Joe's." The original capital of petitioner was supplied entirely by these three men, and after the death of Borgogno in 1937, the two remaining officers acquired his interest in petitioner from his estate. Thereafter Vivalda and Gadeschi each owned 50 per cent of petitioner's 150 shares of issued and outstanding common capital stock. At the time petitioner's business was expanded to include a restaurant petitioner's location at 900 North Broadway was not a desirable place for a restaurant. That part of the building that was opened up by petitioner as a restaurant had been vacant. There was a steel mill next *181 door to it. A restaurant serving Italian foods was operating about one block away in the 800 block of North Broadway at the time petitioner started its restaurant operations. After petitioner had been operating its restaurant for about three years this restaurant in the 800 block was foreclosed by the bank. The building in which it had been operating was sold about 1939 by the bank to a party who then opened a restaurant called the Riviera which served Italian and American food and offered entertainment and dancing. In 1939 a number of Chinese eating and drinking places opened up in petitioner's vicinity and an area known as "Chinatown" developed. Petitioner's officers did not regard the Riviera or the Chinese places as competitors of petitioner. Petitioner's restaurant consisted of a main dining room, a bar, and a smaller back room. The main room seated about 90 persons and the back room between 50 to 55 persons. Petitioner had a free parking place near its building which could accommodate about 125 automobiles. Gadeschi started his business career in 1913 by learning the banking business. During World War I he enlisted in the Army and was transferred to the finance office of the *182 Quartermaster Corps. He had charge of the Fifth Liberty Loan Drive for the Bank of America, and later was in charge of mortgage loans for the Hellman Bank. Vivalda learned the restaurant business as a boy, starting at the bottom in 1907. From that date he was constantly engaged in various capacities in that business. During World War I he was cook for the 145th Field Artillery. In 1920 he helped organize a restaurant corporation called the Cafe Apollo Company, Inc. This restaurant was located in Los Angeles at 425 West 8th Street. Vivalda devoted most of his time to the business of the Cafe Apollo Company, Inc. until 1923. Since 1923 to and through the taxable years 1942 and 1943, both Gadeschi and Vivalda have devoted practically their entire time to the business which they and Borgogno originated and which later became the business of this petitioner. During the taxable years about once a month or once in two months Vivalda would attend a meeting of the Cafe Apollo Company, Inc. of which he was also the president, and from which company he reported a salary of $2,743.53 in each of his returns for the calendar years 1942 and 1943, respectively. Not any of petitioner's employees *183 had supervisory or managerial functions. All of that work was done by its two officers, Vivalda and Gadeschi. The former managed the restaurant and the latter the grocery. Gadeschi also looked after the finances and hired all of the help for both departments. Petitioner had a help turnover of about 25 per cent annually. Out of 62 employees which petitioner had in 1943, only about three had been with the business since it started. During the taxable years both officers worked long hours and took no vacations. Gadeschi was in the hospital one month in 1943. His working hours were usually from 6:00 or 7:00 o'clock in the morning until 9:30 or 10:30 at night. Vivalda's hours were from 7:00 or 8:00 o'clock in the morning until 10:00 at night. The grocery opened at 7:00 A.M. and closed at 7:00 P.M. The restaurant opened at 10:00 A.M. and closed at 9:00 P.M. The business was not open on Sundays. On that day the officers would check up and make necessary repairs and alterations. About every other Sundays or every third Sunday during the summer months the officers would attend picnics and make it a point to meet people and thereby do a little advertising and create goodwill. The average picnic *184 so attended would cost the officer $15 or $20 which he paid out of his own pocket. Although the number of hours worked during the taxable years were the same as during other years, the work itself was actually harder than in previous years. There were more people to serve; sales had increased by a large percentage; more merchandise and food supplies had to be purchased; and there was an acute shortage of meat, other supplies and help during those years, due to the war. The salary arrangement by which these officers were compensated during the taxable years had been in effect with slight modifications ever since 1936 and consisted of a fixed salary, plus a percentage of net profits as indicated in the resolutions hereinafter mentioned. On December 18, 1936, the board of directors of petitioner adopted a resolution, the material part of which is as follows: "Resolved, that beginning January 1, 1936, in addition to the regular monthly salaries, there shall be distributed to the officers of the Corporation a bonus to be determined as follows: "Of the annual net profits one-half shall be reserved for the stockholders, and the remainder shall be distributed as a bonus to the following *185 persons in proportion to their annual salaries: "Joe Vivalda, Matt. A. Borgogno, John Gadeschi. "This resolution shall remain in full force and effect until ordered otherwise by this Board." On December 22, 1937, the board of directors of petitioner adopted the following resolution: "RESOLVED THAT, beginning January 1, 1937, in addition to the regular monthly salaries paid to the officers and employees of the corporation, there shall be distributed to them an annual bonus determined on the following basis: "1. There shall be determined a preliminary net profit, before deducting bonuses, income taxes, and other items of expense, the amount of which is dependent upon the amount of net income. "2. Of this preliminary net profit, there shall be reserved for the stockholders an amount equal to $25.00 per share per year. "3. Of the remaining preliminary net profit, if any, there shall be distributed and paid to the officers and employees a bonus of not more than one-half thereof, the exact amount and its distribution to be fixed from time to time by the principal officers of the Corporation; provided, however, that of the total bonus for each year, thus determined, not less *186 than ten percentum (10%) shall be paid to employees, who are not officers of this corporation, in such manner and proportion, as the principal officers may deem fair and equitable. "All previous resolutions, pertaining to this subject, are hereby revoked, and this resolution shall remain in effect until ordered otherwise by this Board." On January 27, 1939, a resolution was adopted, which was in effect during 1942 and 1943, raising the salaries of Vivalda and Gadeschi each to the sum of $1,000 per month, effective as of January 1, 1939. On June 15, 1939, a resolution was adopted which was identical with the resolution adopted on December 22, 1937, except that instead of pertaining to "the officers and employees of the corporation" it pertained to "the officers and certain employees of the corporation." This resolution was in effect until September 17, 1942. The resolution which was in effect during the taxable years 1942 and 1943 was adopted on September 17, 1942, and is as follows: "WHEREAS it is desirable to stimulate the zeal of this corporation's executives and to reward them adequately for extraordinary efforts made by them in behalf of the enterprise, "NOW THEREFORE *187 BE IT RESOLVED THAT, beginning January 1, 1942, in addition to their regular monthly salaries, there shall be paid to the following executives of this Corporation, namely, John Gadeschi and Joseph Vivalda, an annual bonus to be determined as follows: "1. A preliminary annual net profit shall be determined before the deduction of bonus, capital stock tax, income and profits taxes, and similar items, the amount of which is dependent upon net income. "2. Of this preliminary net profit, there shall be reserved for the stockholders the sum of $25.00 per share of capital stock outstanding at the end of the year, to cover dividend requirements. "3. Of the remaining net profit, if any, one-half shall be distributed and paid to said executives in proportion to the regular monthly compensation paid to them during the year. "4. All previous resolutions, pertaining to this subject are hereby revoked. This resolution shall remain in effect until ordered otherwise by this Board." In accordance with the above-mentioned resolutions petitioner, during the years 1936 to 1943, inclusive, paid to its officers as fixed salaries and contingent bonuses the following amounts: Joe Vivalda
John Gadeschi
Matt Borgogno
Year
Salary
Bonus
Salary
Bonus
Salary
Bonus
Total
1936
$ 3,150
$ 2,195.74
$ 3,150
$ 2,195.73
$ 3,150
$2,195.73
$16,037.20
1937
6,400
6,400
1,600
14,400.00
1938
7,200
1,000.00
7,200
1,000.00
16,400.00
1939
12,000
12,000
24,000.00
1940
12,000
22.94
12,000
22.94
24,045.88
1941
12,000
2,846.68
12,000
2,846.68
29,693.36
1942
12,000
6,946.37
12,000
6,946.38
37,892.75
1943
12,000
26,542.22
12,000
26,542.21
77,084.43
*188 During the years 1936 to 1943, inclusive, the salaries and wages other than to officers, the bonuses other than to officers, the total compensation other than to officers, and the average number of employees of petitioner, as shown by petitioner's records and as returned and claimed by petitioner, are as follows: Total Compensation
Salaries
Other than
Average Number
Year
and Wages
Bonuses
to Officers
of Employees
1936
$23,881.97
$ 1,420.00
$25,301.97
36
1937
35,672.27
1,448.50
37,120.77
44
1938
41,163.66
2,920.50
44,084.16
46
1939
42,613.85
3,196.50
45,810.35
48
1940
46,119.42
3,282.25
49,401.67
46
1941
59,784.95
3,883.87
63,668.82
48
1942
60,086.23
6,527.45
66,613.68
56
1943
79,041.59
13,413.88
92,455.47
62
Petitioner's bonus system was adopted by petitioner as an incentive for better and harder work on the part of its officers and employees. The factors contributing to petitioner's success were, among others, the long hours of diligent personal services performed by its two managing officers and the creation by them of a unique establishment. The restaurant featured Italian foods, a special sausage, *189 black bottom pie and trout flown in from Utah. Petitioner's policy was offering good food served in large quantities at a minimum price without flowers or music. People often remarked about the sawdust on the floors and Vivalda was almost always in the restaurant visiting with patrons and wearing an apron on which were the words "Little Joe" appearing across the top. Other factors consisted of the foresight of the officers in accumulating large inventories when foods and liquors were available at reasonable prices and also the control maintained over operating costs brought about through efficient use of available help and doing an extraordinarily large part of the work themselves. Petitioner had 62 employees in 1943, whereas the average restaurant doing a comparable volume of business would hire between 85 to 100 employees. Petitioner's two officers did all of the managerial work themselves. Management is the most important factor in the success of a restaurant business. Petitioner's total sales, taxable net income as shown on its income tax returns (Form 1120), the percentage of the taxable net income to total sales, the percentage of total compensation (other than to officers) *190 to total sales, the capital stock and surplus as of the beginning of the year, the dividends paid, and the Federal income and profits taxes as shown on its income tax returns (Form 1120) for the years 1936 to 1943, inclusive, as shown by petitioner's records and as returned and claimed by petitioner are stipulated as follows: Taxable
Total
Net
Com-
Capital
Total
Taxable
Income
pensation
Stock &
Dividends
Federal
Year
Sales
Net Income
to Sales
to Sales
Surplus
Paid
Taxes
1936
$214,083.61
$ 6,521.99
3.0%
11.8%
$43,848.02
$4,202.25
$ 875.83
1937
259,676.79
8,855.61
3.4%
14.3%
44,529.83
5,250.00
1,400.21
1938
253,599.33
15,723.68
6.2%
17.4%
43,727.54
3,750.00
2,318.46
1939
231,145.79
5,159.65
2.2%
19.8%
52,690.66
5,250.00
647.35
1940
242,832.80
5,802.12
2.4%
20.3%
51,313.56
3,750.00
874.75
1941
281,350.16
10,185.09
3.6%
22.6%
51,851.43
3,750.00
2,255.66
1942
357,554.71
19,198.95
5.4%
18.6%
55,289.14
3,750.00
5,141.48
1943
532,080.81
59,371.60
11.2%
17.4%
63,790.41
3,750.00
43,466.71
The capital stock and surplus of petitioner as of the close of the year 1943 *191 was the amount of $73,408.12. The restaurant business as a whole is highly competitive and there is a very thin line between success and failure. Mortality in the industry in Los Angeles County during the taxable years was 72 per cent and on a national basis about 50 per cent. The average net profit of the restaurant industry as a whole has averaged between 2.2 per cent and 4.4 per cent to total sales, and the average payroll for the industry has been about 25 per cent to total sales. Sidney Hoedemaker is president and general manager of the Pig'n Whistle Corporation which conducts a chain of 14 restaurants in the Los Angeles area. Its total sales average between $6,000,000 and $6,500,000 a year. During 1942 and 1943 Hoedemaker received from this corporation as compensation for services rendered a salary of $18,000 per annum. Melrose Grotto, Inc. is a corporation organized September 24, 1943 to engage in the restaurant business at 5507 Melrose Avenue, Los Angeles. Its first fiscal year ended September 30, 1944. One of its active managers was Max Morgenthau. The restaurant opened at 3 P.M. and closed at 1 A.M. It handled about 1,500 people a day. During the first year its gross *192 receipts were $340,307.28; its net income before taxes was $27,170.21 or about 7.98 per cent of gross receipts. Its payroll for the first year exclusive of officers' compensation amounted to 25.6 per cent of total sales. Its officers were Dan R. Frank, president; Paul Woolf-son, vice-president; and Morgenthau, secretary-treasurer. At the end of the first year it had 50 employees. Morgenthau worked about 16 hours a day, 7 days a week. He looked after buying the liquor. He owned about 12 or 13 per cent of the corporation's stock and received $10,000 a year as compensation for his services. Frank owned about 8.5 per cent of the stock. His main job was to procure meat for the restaurant. He received $10,440 as compensation for the first year of operations. He also received $200 a month from another concern. Woolf-son, together with his wife, owned as joint tenants 20 per cent of the stock of Melrose Grotto, Inc. He would relieve Morgenthau and Frank when necessary. This required about one-half of the day. The other half of the day he spent operating a meat plant. His compensation for the first year was $5,200. He also $60received a week from Edwin Frank Meat Company. Melrose Grotto, Inc. *193 had one chef and an assistant manager. The latter was paid from $70 to $80 a week. Mosso and Frank Grill Company, sometimes referred to as the Grill, is a corporation engaged in the restaurant business at 6667 Hollywood Boulevard since 1928. John Mosso is its president and Joseph Carissimi is its vice-president. Each officer owns 50 per cent of the corporation's capital stock. The Grill does not serve regular dinners; only a la carte. Prior to the end of November 1943, the Grill's hours were from 7 A.M. to midnight. It had a cocktail bar but did not furnish any entertainment. It had an average of 75 to 80 employees. Its chef had been there for 20 years. He was paid between $400 and $500 a month. There were about a dozen other cooks. The headwaiter has been with the Grill for 18 years and is paid a monthly salary of $400. He keeps all the tips left for him. The head man at the bar is paid $10 a day and the steward is paid $400 a month. Mosso acts as the host at the Grill and is there every night. He leaves the hiring and firing of employees to the staff in the kitchen and the headwaiter. Carissimi watches the kitchen. A steward did all the buying for the Grill and was paid $400 a *194 month. The gross sales of the Grill for 1942 were $442,198.82 and for 1943 they were $630,756.18. The net profits before Federal taxes were $57,548.14 for 1942 and $144,978.92 for 1943, or about 13 and 23 per cent of total sales, respectively. During each of the calendar years 1942 and 1943 the Grill paid $16,200 in dividends. During each of the years 1942 and 1943 each of the officers of the Grill received an annual salary of $6,000 and no bonus. During these years Mosso received from $300 to $400 a month from sources other than the Grill. The Grill made an application to the Salary Stabilization Unit for salary increases of its officers contending that they were worth three times what they were receiving but was turned down. The payroll of the Grill amounted to between 26 and 30 per cent of total sales. Richlore's Incorporated is a restaurant serving a la carte and specializing in hamburgers with a seafood and cocktail bar. The restaurant is located in Beverly Hills about two miles from the center of the Hollywood area. It started operations on August 3, 1942. The corporation's capital stock is owned as follows: Arthur A. Frank (no title)
180   shares
Walter Van de Camp (Sec.-Treas.)
112.5 shares
Lloyd C. Mitchell (no title)
112.5 shares
Lawrence L. Frank (Pres.)
75   shares
Dan R. Frank (vice-pres.)
50   shares
Ralph Frank (vice-pres.) and wife
25   shares
Harry J. Van de Camp (Asst. secry-
treas.) and wife
40   shares
Total
595   shares
*195 Richlore's, Incorporated had between 50 to 55 employees and seven officers. It employed a manager who was not an officer and paid him a definite salary of $200 a week. This manager devoted his full time to this corporation. Richlore's payroll was about 25 per cent of total sales. Its gross sales from August 3, 1942 to December 31, 1942 were $71,452.62 and for 1943 they were $271,683.01. It had a net loss for 1942 of $7,768.48 and a net profit before Federal taxes for 1943 of $33,722.23. A reasonable allowance for salaries or other compensation for personal services actually rendered to petitioner by each of its officers, Vivalda and Gadeschi, was $16,000 for the taxable year 1942 and $20,000 for the taxable year 1943, allocated as follows: Joe Vivalda
John Gadeschi
Year
Salary
Bonus
Salary
Bonus
Total
1942
$12,000
$4,000
$12,000
$4,000
$32,000
1943
12,000
8,000
12,000
8,000
40,000
Opinion BLACK, Judge: The sole remaining issue in this proceeding is whether the respondent erred in disallowing under section 23 (a) (1) (A) of the Internal Revenue Code, as amended, [2] the amounts of $13,892.75 and $53,084.43 *196 as deductions from gross income for the taxable years ending December 31, 1942 and 1943, respectively, which amounts were paid by petitioner during the respective taxable years to its two stockholding officers as representing additional compensation in the form of contingent bonuses. The amounts paid each officer, together with their regular salaries, were as follows: 1942
1943
Bonus to Vivalda
$ 6,946.37
$26,542.22
Bonus to Gadeschi
6,946.38
26,542.21
Total contingent bonuses
13,892.75
53,084.43
Regular salary to Vivalda
12,000.00
12,000.00
Regular salary to Gadeschi
12,000.00
12,000.00
Total amounts paid
$37,892.75
$77,084.43
The respondent, in determining the deficiencies herein, allowed petitioner a deduction of $24,000 each *197 year as "reasonable compensation" on account of the regular salaries paid its two officers, but disallowed the bonuses as being "in excess of a reasonable compensation for services rendered by said officers" (see footnote 1, supra). It is well settled that the question of what constitutes reasonable compensation under the statute here involved is essentially a question of fact to be determined from all the peculiar facts and circumstances in each particular case; and that a determination by the Commissioner of a reasonable allowance for compensation in a specific case carries a clear presumption of correctness and places upon the taxpayer the burden of proving that it is entitled to a deduction larger than that determined by the Commissioner. Miller Manufacturing Co. v. Commissioner, 149 Fed. (2d) 421; Draper & Company, Incorporated, 5 T.C. 822, 839. In the instant proceeding the respondent contends that from the entire record we should find as ultimate facts that: "* * * the petitioner has wholly failed to overcome the presumptively correct determination of the Commissioner; that the officers' bonuses in question, aggregating $13,892.75 and $53,084.43, *198 for 1942 and 1943, respectively, in fact constituted dividends and distributions of profits to the sole stockholders; that they were not real bonuses; that they did not represent true compensation for services rendered; and that they are unreasonable and are not deductible." On the other hand, petitioner contends that on the basis of all of the proven facts and circumstances it is entitled to deduct under section 23 (a) (1) (A), supra, as reasonable compensation paid its officers all the bonuses in addition to the regular salaries. Petitioner in support of its contention offered in addition to certain documentary evidence the testimony of its two managing officers, Vivalda and Gadeschi, and the testimony of Hoedemaker. The respondent offered certain documentary evidence and the testimony of three witnesses, Morgenthau, Mosso and Walter Van de Camp. We think petitioner has proven that for the taxable years here involved it is entitled to deduct as reasonable compensation paid its officers more than the regular salaries allowed by the respondent. We do not think, however, that it is entitled to deduct the full amount of the bonuses paid. The bonuses were paid in accordance with *199 a plan that had been established by petitioner as early as 1936. The plan provided for contingent bonuses and was modified slightly from time to time. For the taxable years it provided that a preliminary net profit should first be determined, exclusive of any deduction for bonuses, Federal taxes and similar items, the amount of which is dependent upon net income. It then provided that of this preliminary net profit there should be reserved for the stockholders the sum $25of per share as a dividend, and that "Of the remaining net profit, if any, one-half shall be distributed and paid to said executives in proportion to the regular monthly compensation paid to them during the year." (A)-6 Section 29.23 (a)-6 of Treasury Regulations 111 provides, among other things, that the test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services. Several illustrations of the test are given in the regulations and those which we deem material here are in the margin. [3] Substantially similar regulations have been held to be fair interpretations of the Congressional intention. H. Levine & Bros., Inc. v. Commissioner, 101 Fed. (2d) 391. *200 *201 Vivalda and Gadeschi each owned 50 per cent of petitioner's outstanding capital stock. This being true, it would not make much difference, if any, to petitioner and, its stockholders, except taxwise, whether petitioner distributed its earnings as dividends or in the form of compensation. The bonus plan under which petitioner was operating was so drawn that although petitioner's profits might increase materially the amount reserved for dividends remained stationary, whereas the amount to be distributed as bonuses would increase in proportion to the increased profits. For instance, during the years 1939 to 1943, inclusive, petitioner's net income as returned by it (exclusive of any deduction for bonuses to officers) was $5,159.65 for 1939; $5,848 for 1940; $15,878.45 for 1941; $33,091.70 for 1942; and $112,456.03 for 1943. The dividends reserved under the plan for each year were $25 per share or $3,750 for each year whereas the bonuses determined under the plan were nought for 1939; $45.88 for 1940; $5,693.36 for 1941; $13,892.75 for 1942; and $53,084.43 for 1943. Each of the two officers was paid a regular salary of $12,000 per annum for each of the years 1939 to 1943, inclusive, *202 and the actual dividends declared and paid for these years were $5,250 ( $35 per share) for 1939 and $3,750 ( $25 per share) for each of the other years. Of course, if the total payments to Vivalda and Gadeschi were, in fact payments purely for services and were reasonable under all the circumstances, they would be deductible under section 23 (a) (1) (A), supra, in any event. The Christman Company, 8 T.C. 679, promulgated March 31, 1947. Upon the basis, however, of all the facts and circumstances present in the instant proceeding it is our opinion that the total bonuses when added to the basic salaries exceed the reasonable allowance specified in the statute. We think that some part of the bonuses paid during the taxable years must be regarded as in substance a substitute for dividend distributions. The facts here are materially different from the facts in Draper & Company, Incorporated, supra, a case heavily relied upon by petitioner. In that case we found that the contingent bonus plan there involved had been adopted by the taxpayer in an arms length transaction without reference to stock ownership prior to the taxable year and that the bonuses paid *203 under the plan when added to the basic salaries were not in excess of the reasonable allowance specified in the statute. In our opinion we pointed out that the bonuses there being considered were purely for personal services actually rendered and were never intended as a guise for something else; and that the payments in question bore no relation to the stock ownership of the recipients. In the instant proceeding the payments in question necessarily bear a direct relation to the stock ownership of Vivalda and Gadeschi. Each of these officers owns 50 per cent of petitioner's stock and each is paid equal regular salaries and equal contingent bonuses. These facts also-distinguish the instant case from Capital-Barg Cry Cleaning Co. v. Commissioner, 131 Fed. (2d) 712, a case which petitioner in its brief says "the facts are very similar to those of the case at bar." The compensation there involved was $23,840 paid to William F. Hummel and $11,420 to Jerome D. Shanman. Hummel and his wife together owned almost 80 per cent of the stock of that taxpayer whereas Shanman only owned 3 shares out of a total of 1,470 shares. We do not, therefore, consider the material facts in either *204 the Draper or the Capital-Barg cases as being altogether similar to the material facts of the case at bar. At the conclusion of our findings of fact we have found as ultimate facts that a reasonable compensation allowance for personal services actually rendered by each of the petitioner's two officers included, in addition to the regular salaries allowed by the respondent, $4,000 for each officer of the contingent bonuses paid for 1942 and $8,000 for each officer of the contingent bonuses paid for 1943. We think the evidence, as a whole, requires findings to that effect. We will not attempt to review all of the evidence in this opinion. The material evidentiary facts are all set out in our findings. Suffice it to say that we do not think the three restaurants concerning which the respondent offered evidence are at all comparable with petitioner. Two of these restaurants, Melrose Grotto and Richlore's were first opened during the taxable years here in question. Melrose Grotto had three officers, two of whom devoted only a part of their time to that corporation, and the third officer, Morgenthau, while devoting his full time performed limited services. Mosso and Frank Grill Company *205 was an old established restaurant with two full-time officers each of whom owned 50 per cent of the corporation's stock. Its operating hours were from 7 A.M. to midnight and it furnished no entertainment. To this extent it was somewhat comparable with petitioner but here the comparison ends. Its two officers did not begin to perform the services performed by Vivalda and Gadeschi but delegated such services to the corporation's employees. It showed a healthy percentage of net income to total sales which was due very likely to the low salaries paid to its two officers. The Grill made an application to the Salary Stabilization Unit for salary increases of its two officers contending that they were worth three times what they were getting but this application was turned down. We do not regard the salaries paid to the officers of Melrose Grotto and the Grill as constituting valid comparisons. Richlore's was run by an employee manager. The corporation had seven officers but their duties were very limited and no evidence was received as to the compensation paid these officers. There is no doubt that both Vivalda and Gadeschi were men of considerable executive ability. Hoedemaker testified *206 that he was well acquainted with petitioner's restaurant; that in his opinion a minimum. remuneration for each of petitioner's two officers should be $15,000 a year from 1936 on through the taxable years 1942 and 1943; and that for the taxable years he would add $5,000 or $6,000 for each one on account of increased burdens. By working long hours and performing tasks that other restaurants would hire issistants to do, Vivalda and Gadeschi were able to keep the payroll down to a minimum. Petitioner's payroll costs for the two taxable years averaged 18 per cent of sales whereas the average for the industry as a whole was about 25 per cent of the total sales. The restaurants concerning which the respondent offered testimony showed the following payroll costs: Melrose Grotto 25.6 per cent; Mosso and Frank Grill Company never less than 26 per cent; and Richlore's around 25 per cent. Although we do not regard these three last named restaurants as comparable to petitioner's restaurant, the above percentages of payroll costs show that they are about in line with the industry as a whole, whereas petitioner, due to efficient management, was able to operate at a much lower percentage and thus *207 show a considerably larger percentage of net income to total sales then enjoyed by the industry as a whole. We think, however, that in arriving at our ultimate finding set out in our findings of fact that we have given the proper weight to all of the evidence and arguments of record. At least we have endeavored to do so. The deficiencies should be redetermined accordingly. Decision will be entered under Rule 50. Footnotes
1. (a) It is determined, under the provisions of section 23 (a) (1) of the Internal Revenue Code, that the deductions claimed for compensation of your officers are in excess of a reasonable compensation for services rendered by said officers, as shown in the following: Reasonable
Exces-
Amount
compen-
sive
Name, Title
claimed
sation
amount
Joseph Vivalda,
president
$18,946.37
$12,000.00
$ 6,946.37
John Gadeschi,
secy.-treas.
18,946.38
12,000.00
6,946.38
Totals
$37,892.75
$24,000.00
$13,892.75
The excessive amount of $13,892.75 is disallowed as a deduction.↩
2. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered * * *.↩
3. Sec. 29.23 (a)-6. Compensation for Personal Services. - * * * This test and its practical application may be further stated and illustrated as follows: (1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. (a) An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services, and the excessive payments correspond or bear a close relationship to the stock holdings of the officers or employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. * * * (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is in general just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. * * *↩