The Esrenco Truck Co., et al. [1] v. Commissioner. Esrenco Truck Co. v. Commissioner
Docket Nos. 84146, 84147, 91169, 92765.
United States Tax Court
T.C. Memo 1963-72; 1963 Tax Ct. Memo LEXIS 271; 22 T.C.M. (CCH) 287; T.C.M. (RIA) 63072; March 13, 1963
Stanley Worth, Esq., Transportation Bldg., Washington, D.C., and Jules G. Korner, III, Esq., for the petitioners. *273 Laurence Goldfein, Esq., and Joseph N. Ingolia, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In these consolidated proceedings respondent determined deficiencies in petitioners' Federal income taxes in the amounts and for the taxable years as follows: Fiscal Year
Docket No.
Petitioner
Ended July 31
Deficiency
84146
The Esrenco Truck Co.
1956
$ 1,816.67
1957
2,242.91
84147
The Eastern Shore Rendering Co.
1954
4,050.00
1955
9,491.92
1958
15,401.47
91169
The Esrenco Truck Co.
1958
8,620.00
92765
Esrenco Associates, Inc.
1958
2,018.43
The issues presented for our decision are: (1) Whether the principal purpose for the acquisition of The Esrenco Truck Co. and Esrenco Associates, Inc., was evasion or avoidance of Federal income tax within the meaning of section 269[2] by securing the benefit of exemptions from surtax allowed by section 11(c); (2) whether a major purpose for the transfer of property to The Esrenco Truck Co. was avoidance of Federal income tax within the meaning of section 1551 in securing the benefit of an exemption from surtax; (3) whether, in the *274 alternative to issues (1) and (2), the taxable income of The Esrenco Truck Co. for the fiscal year ended July 31, 1958, constitutes income to The Eastern Shore Rendering Co. within the provisions of section 482; (4) whether the amount of $1,500 paid in each of the fiscal years ended July 31, 1955, 1956, and 1957 by The Eastern Shore Rendering Co. to its sole stockholder constituted interest paid on an indebtedness or a nondeductible distribution of earnings and profits; and (5) whether certain portions of salaries paid by The Eastern Shore Rendering Co. during the fiscal years ended July 31, 1955, 1956, and u957 and by The Esrenco Truck Co. during the f1scal years ended July 31, 1956, 1957, and 1958 to their president constituted unreasonable compensation. Respondent also disallowed certain depreciation deductions to The Esrenco Truck Co. for the fiscal years ended July 31, 1956, and 1957 and to The Eastern Shore Rendering Co. for the fiscal year ended July 31, 1957. Petitioners did not assign error to these determinations nor did they raise the issue at trial or on brief. *275 We therefore assume petitioners concede the correctness of respondent's determinations with respect to depreciation. In Docket No. 92765 the notice of deficiency denied the benefit of an exemption from surtax to Esrenco Associates, Inc., pursuant to sections 269 and 1551. On brief, however, respondent argues that the surtax exemption should be denied to Esrenco Associates, Inc., pursuant to section 269. No argument is made with respect to section 1551. We interpret respondent's argument as an abandonment of the applicability of section 1551 to Esrenco Associates, Inc. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our findings by this reference. Petitioners are three Maryland corporations, organized on July 24, 1952, by Elwood J. Pliescott, sometimes hereinafter referred to as Pliescott. The corporations are: The Eastern Shore Rendering Co., sometimes hereinafter referred to as Eastern; The Esrenco Truck Co., sometimes hereinafter referred to as Esrenco; and Esrenco Associates, Inc., sometimes hereinafter referred to as Associates. Petitioners filed *276 their Federal income tax returns for the years involved herein with the district director of internal revenue at Baltimore, Maryland, using a fiscal year ending July 31. Pliescott's formal education concluded when he finished high school. After working as a laborer, a truck driver, and a candy salesman, Pliescott went into business for himself, acquiring and selling dead animals to rendering plants. Sometime in 1939 he started a small rendering plant of his own at Laceyville, Pennsylvania, in which he rendered dead horses, cattle, sheep, and hogs. Thereafter, Pliescott observed that the eastern shore of Maryland had but one poultry rendering plant and, sensing an opportunity to start such a business of his own, he sold his Laceyville plant and moved to the Cambridge, Maryland, area sometime in 1947. Pliescott discovered that in some respects the rendering of poultry differed from the more familiar methods he employed in Pennsylvania. He acquired his present knowledge of poultry rendering primarily from the experience gained in setting up and operating his plant in Maryland. His products consist of a clear grease and two types of poultry meal, of which one results from rendering *277 chicken blood and feathers and the other from rendering chicken heads, legs, offal, and the whole bodies of condemned birds. The clear grease, a by-product of the meal process, is separated from the meal and stored separately. Both the meal and the grease are eventually sold, either to the chemical industry or to the poultry feed industry for use in manufacturing commercial poultry feed. The process, by which the raw materials which Pliescott purchases from poultry processing companies are reduced to a meal, consists of cooking, pressing, grinding, and drying, each step of which requires skill and knowledge of the trade. Beginning in June 1948, when his new plant was ready for operation, Pliescott conducted business as a sole proprietor, either in his own name or under the trade name The Eastern Shore Rendering Co. His new business prospered, showing sales and net income as follows: Fiscal Year
Ended July 31
Sales
Net Income
1949
$172,529.67
$59,318.02
1950
225,415.63
41,097.95
1951
359,173.77
90,455.45
Pliescott used his own trucks to pick up and deliver finished foods and raw materials. The risks of the rendering business include *278 liability arising from product contamination, damage suits arising from trucking accidents, and loss due to fire. Product contamination may occur from the use of diseased poultry as raw material. Contaminated poultry meal used as poultry feed may cause diseases known as Salmonella and air sac which could result in the loss of the ultimate purchaser's flock of poultry. One company in the rendering business was sued in or about 1959 because of a contaminated product it produced. Product liability was feared most as a risk of the rendering business by one of Pliescott's competitors. Damage claims from trucking accidents occurred frequently while the business was operated as a sole proprietorship and subsequently thereto. During the years 1951 and 1952 a number of highway accidents involving the trucks of the business resulted in the cancellation of insurance covering such risks by the insurer. Fire hazards by spontaneous combustion arise in connection with the storage of poultry meal which consists of animal proteins and fat. In the summer of 1952 Pliescott became concerned about his personal liability in the event of a serious accident involving one of his trucks. There was also a *279 remote possibility that he might be found liable for heavy damages if his products should be contaminated and destroy large flocks of poultry. Pliescott consulted his attorney on the possibility of incorporating his business. The attorney advised Pliescott to separate the proprietorship into three corporations - a land-owning corporation to hold title to his real estate, a manufacturing corporation to perform the rendering operation, and a trucking corporation to haul the raw materials and finished products. Pliescott's accountant was consulted as to the tax consequences of forming three corporations, and he assured Pliescott's attorney that the tax consequences would be favorable rather than unfavorable. The accountant prepared a pro-forma balance sheet showing the proposed transfer of money and assets to each of the three corporations as well as the proposed issuance of stock and debentures in exchange for the assets. The corporations were organized and Pliescott and his wife transferred real estate to Associates. Associates issued capital stock and debentures to Pliescott and his wife in equal amounts because the real estate transferred to Associates had been owned by both as *280 tenants by the entirety. All of the assets transferred to Eastern and Esrenco were the separate property of Pliescott and he received all the stock and debentures issued by those two companies. Eastern received various assets needed to carry on the rendering business from Pliescott. These assets had a book value of approximately $85,870, although their net value was only $44,000. Pliescott received stock with a par value of $10,000 and a 10-year 6 percent unsecured corporate debenture in the amount of $34,000 in exchange for these assets. The debenture dated September 26, 1952, issued by Eastern, provided as follows: For Value Received, The Eastern Shore Rendering Co. promises to pay unto Elwood J. Pliescott, at its office in Dorchester County, Maryland, or order, the sum of Thirty-Four Thousand Dollars ($34,000.00), ten years from this date, with interest thereon from the date hereof, at a rate of six per centum per annum, payable every year from the date hereof, during said time for such further time or times as said principal sum or any part thereof shall remain unpaid. Option is reserved in the maker hereof to pay all or any part of the principal indebtedness at any time after *281 five years from the date hereof, with interest on the unpaid balance only to the date of such payments. And, we the undersigned makers and endorsers hereof, authorize the Clerk or proper official of any Court of Record to enter judgment, at any time after maturity, on this note for the amount thereof, including debt, interest, costs and ten per centum attorneys' fees for collection, without summons or process. The makers and endorsers of this obligation, as to same, waive demand, protest, notice of protest, and the benefit of all exemption and homestead laws. As witness the name and corporate seal of The Eastern Shore Rendering Co. and the signature of Elwood J. Pliescott, its President, attested by Ruth W. Pliescott, its Secretary. Esrenco received assets from Pliescott with a net value of $8,000 in exchange for stock with a par value of $2,000 and a 10-year 6 percent unsecured corporate debenture in the amount of $6,000. Associates received assets from Pliescott and his wife having a net asset value of $58,000 in exchange for stock having a par value of $12,000 and a 10-year 4 percent unsecured corporate debenture in the amount of $46,000. The actual cash transferred to the *282 corporations was: To Eastern $263.60; to Esrenco $255.46; and to Associates $762.26. Pliescott also advanced approximately $20,000 in cash to Eastern on August 1, 1952. Originally, Pliescott's attorney intended that Esrenco act solely as a trucking company, but he discovered that if Esrenco hauled property which it did not own it would have to obtain a certificate of convenience and necessity and be subjected to the jurisdiction and control of the Interstate Commerce Commission. To avoid this complication, Esrenco's charter was amended on September 19, 1952, to permit it to buy and sell products on its own account. Thereafter, Esrenco purchased raw materials which it hauled to Eastern's plant. The raw materials were then sold to Eastern for processing and, upon completion of the rendering process, Eastern sold its finished products to Esrenco, which in turn sold them to its customers. Esrenco's charges to Eastern for raw materials sold to it reflected a profit comparable to that which Esrenco would have earned as a contracthauling company, and it also earned a similar price differential on finished goods purchased from Eastern and resold. Esrenco derived no profit from transactions *283 in which it merely purchased and resold without actually hauling the goods purchased to the ultimate buyer. Both the rates charged for hauling and the prices paid for finished goods varied, the latter being governed by world-wide market conditions which subjected it to wide fluctuation. After petitioners were formed, the operation of the rendering business, its suppliers and customers, and the tasks performed by Pliescott remained basically the same as under the proprietorship. At the time of incorporation no agreement was executed respecting Pliescott's individual indebtedness transferred to petitioners, although he has since been called upon to personally guarantee some of petitioners' subsequently incurred indebtedness. Occasionally, but usually only in emergencies, Eastern's mechanics worked on Esrenco's trucks and Esrenco's drivers worked in Eastern's plant. Pliescott considered the three petitioners as a single operation. Sometime in 1951 a fire occurred which caused only slight damage to Pliescott's rendering plant, but in 1957 about 90 percent of the plant, which was constructed of cinderblock and wood, was destroyed by a fire which put Eastern out of business for approximately *284 5 months. Pliescott designed the layout of Eastern's present plant, which replaced the one destroyed by the 1957 fire, without the services of an architect or an engineer. He also planned the alignment and location of the plant's machines, a large number of which he designed and built. Eastern's plant is modern and efficient and normally operates on three shifts over a 24-hour period. It is automated to such an extent that only 5 men on one shift are needed to operate it. These men work under the supervision of a single foreman who supervises all three shifts, and Eastern has no supervisory, managerial, or executive employees other than Pliescott. Between 1956 and 1958 Pliescott received an annual salary of $24,000 per year from Eastern. For the fiscal years 1953 through 1958 Eastern's operations are summarized as follows: Fiscal Year
Net Income Before
Ended July 31
Sales
Income Taxes
1953
$364,263.73
$ 20,237.11
1954
462,171.72
32,143.46
1955
541,984.52
25,629.39
1956
611,927.53
(25,845.25)
1957
465,710.51
(20,511.31)
1958
979,769.23
117,558.53
Respondent disallowed as a deduction in each of the fiscal years ended July 31, 1955, 1956, *285 and 1957 $1,500 of the amounts received by Pliescott from Eastern as interest on the $34,000 debenture. On or about December 31, 1957, $25,000 of this amount was repaid and on or about January 1, 1960, the remaining $9,000, together with the interest due thereon, was paid to Pliescott by Eastern. During the years 1956 through 1958 Pliescott received an annual salary of $12,000 from Esrenco. For the fiscal years 1953 through 1958 Esrenco's operations are summarized as follows: Fiscal Year
Net Income
Ended July 31
Sales
Before Taxes
1953
$ 197,832.68
$11,157.56
1954
313,714.75
30,737.60
1955
383,408.00
6,631.78
1956
441,922.05
16,801.65
1957
765,246.50
16,230.26
1958
1,604,025.48
31,154.17 Included among Esrenco's total sales are its sales of raw materials to Eastern as well as its sales of finished products purchased from Eastern for resale, and to that extent the sales figures above include Eastern's purchases of raw materials as well as its sales of finished goods. During the period in 1957 in which Eastern's plant closed down to rebuild after a fire, Esrenco reduced its hauling charge from $4 a ton to $3.75 a ton as a temporary *286 measure until Esrenco's only customer, Eastern, resumed business. During the period Eastern was not operating, Esrenco continued to buy both raw materials and finished products which it sold to other rendering plants. One such purchaser of raw materials in the rendering business made purchases from Esrenco in order to help out Pliescott so that he would not lose his source of supply. Pliescott received small salary payments from Associates in its fiscal years 1953 and 1954, but he has not since received any further salary payments from Associates. In addition to the real estate leased to Esrenco and Eastern, Associates owned and obtained rents from some farmland and timberland. Associates' operations for the fiscal years 1953 through 1958 are summarized as follows: Rents Received From
Fiscal Year
Net Income
Ended July 31
Eastern
Esrenco
Other
Before Taxes
1953
$15,000
$1,200
$ 7,183.46
1954
15,000
1,450 $400
9,734.34
1955
15,000
3,200
300
11,633.37
1956
15,000
3,200
400
10,944.52
1957
9,375
3,200
370
5,423.07
1958
18,700
3,200
9,657.60 Since the incorporation of Eastern, Esrenco, and *287 Associates and through the fiscal year ended July 31, 1958, there have never been any formal written contracts for the rental of real estate by Eastern and Esrenco from Associates. In the year 1957, when the business suffered a fire, the rentals from Eastern to Associates were greatly reduced, and in the year 1958, when Eastern reported a net income before taxes of $117,558.53, the rental was increased by $3,700 over the rental in prior years. The salary payments received by Pliescott from Eastern and Esrenco, in each of the years involved herein, were comparable to the salaries paid to similarly situated executives in related businesses. An executive and director of Eastern's competitor, a corporation of approximately the same size, received a salary and director's fees totaling $30,800 annually, and he shared the duties performed by Pliescott for petitioner with several other top management personnel. In addition to designing and rebuilding Eastern's plant, Pliescott served as Eastern's executive, manager, and supervisor. He alone was in charge of all the operations of the rendering business. Pliescott supervised the employees of Esrenco which include 17 or 18 truck drivers and *288 one mechanic. Pliescott was responsible for the negotiating of the purchases of raw materials and the setting of the prices of finished goods. In summary, Pliescott was responsible for and conducted the entire operation of the rendering business. Pliescott's salary bore a reasonable relation to the services performed by him, and the success of the petitioners is, in large measure, attributable to his knowledge, efforts, and resourcefulness. Esrenco operates approximately 34 trucks, most of which are either stake-body or dump trucks specially adapted for the products it hauls [they haul]. Pliescott designed and built a number of watertight, stake-bodied trucks welded together with a watertight drop gate or door. These trucks make trips as far away as Baltimore, Maryland, a distance of 80 miles. It is Esrenco's policy to pay damage claims resulting from truck accidents up to certain amounts, probably no more than $1,000, rather than submit them to its insurer. This is done in order to maintain a good experience rating and to avoid the possibility that its policies might be canceled. Pliescott could not hire the best caliber of drivers. There were many trucking accidents which resulted *289 in cancellation of Esrenco's insurance by the insurer in 1953. Petitioners maintain their offices in a small building leased by Associates to Eastern, and Eastern charges Esrenco and Associates on a pro rata basis for office space and secretarial and bookkeeping service. Separate books, bank accounts, and social security records are maintained for each corporation. Transactions between Esrenco and Eastern are handled by entries in intracompany accounts, and payments were made by periodically transferring amounts from the bank account of one company to the bank account of the other, usually by checks drawn to even amounts. Advertising expenses of the business were borne by Eastern, and only Eastern maintained a listing in the telephone directory. Prior to incorporation the property belonging to Pliescott's sole proprietorship was covered by fire insurance. After the incorporation, fire insurance coverage for the plant building and equipment was provided in a single policy under which both Associates and Eastern were the named insured. The truck accident policy, both before and after incorporation, reflected coverage limited to $100,000 and $300,000. The proprietorship did not carry *290 product-contamination liability insurance in 1951, and 1 year after its incorporation such insurance was not carried by any of petitioners. In 1958 all three petitioners were covered by a single policy against the product-contamination risk. Each petitioner has three directors. Pliescott is and has been the president and a director of all three corporations, and his wife is and has been secretary and a director of each. No dividends have been paid by petitioners between the date of their incorporation and July 31, 1958. Respondent determined that the total amounts paid to Pliescott by Esrenco and Eastern as salaries during the taxable years ended July 31, 1955 through 1958 were unreasonable compensation, and he disallowed one-half of the amounts paid to Pliescott as follows: Year Ended
Amount
Disallowed
July 31
Esrenco
Eastern
1955
$12,000
1956
$6,000
12,000
1957
6,000
12,000
1958
6,000 For the taxable years ended July 31, 1955, 1956, and 1957 respondent disallowed the interest paid by Eastern on $25,000 of the $34,000 debenture issued by Eastern to Pliescott. For the taxable year 1958 respondent added Esrenco's entire taxable *291 income amounting to $29,618.21 to that of Eastern, relying on section 482. Eastern's net operating loss carrybacks for the taxable years 1956 and 1957 were reduced as a result of the foregoing adjustments, and respondent further determined that both Associates and Esrenco were not entitled to the surtax exemption allowed by section 11(c) for the taxable year 1958, relying upon sections 269 and 1551. Opinion KERN, Judge: Respondent first contends that "the principal purpose" for Pliescott's acquisition of control of Associates and Esrenco was avoidance of Federal income taxes within the meaning of section 269 by securing the benefit of exemptions from surtax which he would not otherwise have enjoyed. Petitioners contend that neither Esrenco nor Associates was formed or availed of for the principal purpose of avoiding Federal income tax, but that each corporation was separately organized and operated solely for valid business reasons, i.e., to separate the risks inherent in the rendering operation from those involved in the trucking operation, and to separate the risks of such operations from the ownership of realty. *292 Section 269[3] disallows any deduction, credit, or allowance obtained through acquisition or control of a corporation if the principal purpose of the acquisition was for the purpose of evasion or avoidance of Federal income tax. There is no dispute that Pliescott's ownership of 100 percent of the stock of Esrenco and 50 percent of the stock of Associates constituted control as defined in the statute. The surtax exemption provided in section 11(c) is among the deductions, credits, or allowances contemplated which may be disallowed pursuant to section 269. See James Realty Company v. United States, 280 F. 2d 394. Further, the deductions, credits, or allowances may be disallowed to an acquired corporation which is created primarily for the purpose of avoiding tax. James Realty Company v. United States, supra, Thomas E. Snyder Sons Co., 34 T.C. 400, affd., 288 F. 2d 36, certiorari denied 368 U.S. 823; Urban Redevelopment Corporation, 34 T.C. 845, affd., 294 F. 2d 328. *293 Therefore, the narrow question to be decided is whether petitioners have carried their burden of demonstrating that a tax avoidance purpose did not exceed in importance any other purpose. Sec. 29.129-3, Regs. 111; sec. 39.129-3, Regs. 118; sec. 1.269-3, Income Tax Regs.; Commodores Point Terminal Corporation, 11 T.C. 411. See Elko Realty Co., 29 T.C. 1012, affd., 260 F. 2d 949. Respondent would have us discount the reasons given by Pliescott for the acquisition of Esrenco. Respondent notes the tax advantage gained by Pliescott in acquiring Esrenco and argues, citing Army Times Sales Co., 35 T.C. 688, that such results once accomplished must have been intended. In reaching the conclusion in Army Times Sales Co., supra, that a sole stockholder's purpose in acquiring control of a corporation was to avoid Federal income tax by securing the benefits of deductions which he would not otherwise have enjoyed, we said at page 704: The judicial ascertainment of someone's subjective interest or purpose motivating actions on his part is frequently difficult. One method by which such ascertainment may be made is to consider what *294 the immediate, proximate, and reasonably to be anticipated consequences of such actions are and to reason that the person who takes such actions intends to accomplish their consequences. This reasoning is implicit in the Latin maxim "acta exteriora indicant interiora secreta", and in the more homely English adage "actions speak louder than words." In that case we found oral testimony to the effect that a business purpose motivated the acquisition of a corporation to be implausible in the light of evidence of record that the acquired corporation was insolvent and a failure as a business venture. In the instant case there are no such compelling circumstances to lead us to doubt Pliescott's oral testimony that his actions were motivated by business purposes. Respondent's argument that Pliescott must have intended to enjoy the benefits of exemption from surtax overlooks the requirement in section 269 that the principal purpose for the acquisition of a corporation must have been to avoid Federal income taxes. Cf. Commodores Point Terminal Corporation, supra; *295 Alcorn Wholesale Co., 16 T.C. 75. From the record before us we conclude that Pliescott's primary concern was to gain the maximum protection against risks inherent in the manufacture of rendered products and in the hauling of those products. Respondent questions the bona fides of Pliescott's business judgment by arguing that product contamination was a remote possibility, that insurance coverage would limit risks from trucking accidents, and that fire hazards were not reduced by incorporation. While there is some merit in these arguments they do not cast doubt on the fact that it was the exercise of sound business judgment which led to the acquisition of Esrenco. Pliescott's concern for accident and product liability was not illusory. The record establishes that the best caliber of drivers could not be employed in the rendering business. Numerous accidents resulted in the insurer's cancellation of Pliescott's accident insurance in 1953. Further, the production of a contaminated product in the rendering business, although a remote possibility, was not unknown, and was feared most as a risk of the rendering business by one of Pliescott's competitors. It is also significant *296 that it was Pliescott's attorney who decided that three corporations rather than one should be organized. By such an arrangement it was the expectation of Pliescott and his advisor that the damages for liability arising from the manufacture of a contaminated product would be limited to the assets of the rendering company, that the damages for liability arising from truck accidents would be limited to the assets of the trucking company, and that the real estate would be isolated from such risks. Pliescott's attorney, after his decision and advice to Pliescott, consulted with Pliescott's accountant as to whether there would be any disadvantageous tax consequences by forming three corporations. Upon the accountant's assurance that the tax consequences were favorable rather than unfavorable the plan was executed. The evidence of record establishes that Pliescott's purpose in acquiring Esrenco was for bona fide business reasons and that Esrenco would have been created absent any tax advantage. We therefore hold that the stock of Esrenco was not acquired for the principal purpose of tax avoidance by securing additional exemptions from surtax which Pliescott would not otherwise have enjoyed. *297 Cf. Goodwyn Crockery Co., 37 T.C. 355, on appeal (C.A. 6, March 29, 1962); Baton Rouge Supply Co., 36 T.C. 1. If Associates is to sustain its burden of proof that it was not acquired for the principal purpose of tax avoidance, it must establish that it was acquired for a business purpose. Associates was formed in order to hold title to real estate owned by Pliescott and his wife and collect rents therefrom. The alleged business purpose for its formation was to insulate the land from risks inherent in the manufacturing and trucking operations of the rendering business. Associates never had any employees and it did not pay any salary to Pliescott, except for small salary payments in the fiscal years ended in 1953 and 1954. No formal leases were executed for the property leased to Eastern and Esrenco, and in 1957, when Eastern was put out of operation as a result of fire, Eastern paid no rent to Associates. Associates' rental income from other sources was insignificant. From this evidence we find that Associates was a mere corporate shell to hold title to real estate and served no bona fide business purpose. We therefore conclude that it was acquired to secure *298 an exemption from surtax which Pliescott would not have enjoyed. On this issue we hold for respondent. The next issue is whether Esrenco should be denied the surtax exemption under section 1551. [4] Respondent contends that Esrenco was formed for the purpose of acquiring rendered products from Eastern and leasing garage buildings from Associates; that after the transfer of these properties Pliescott controlled all three corporations, and that petitioners have failed to establish by a clear preponderance of the evidence that the securing of the surtax exemption was not a major purpose of the transfers. *299 Petitioners' contention is that Esrenco was not formed for the purpose of acquiring rendered products from Eastern, that the sale of goods from Eastern to Esrenco and the leasing of garage space from Associates do not constitute transfers within the contemplation of section 1551, and finally that the securing of a surtax exemption was not a major purpose of such transfers. Since we are of the opinion that the securing of a surtax exemption was not a major purpose of the transfers of the properties here in question, [5] it is not necessary for us to decide the other contentions of the parties on this issue. Whether the securing of a surtax exemption is a major purpose of a transfer is a question of fact to be resolved upon a *300 consideration of all the circumstances relevant to the transaction, and the burden of proving by the clear preponderance of the evidence that securing the exemption from surtax was not a major purpose of the transfer is placed upon petitioner by statute. Truck Terminals, Inc., 33 T.C. 876. See also Sno-Frost, Inc., 31 T.C. 1058. In Truck Terminals, Inc., supra at 885, we concluded: * * * that the major quality of a "purpose" within the framework of the statutory sections here involved is to be determined in the light of the effect which consideration of securing the exemption and credit had upon producing the decision to create or activate the new corporation. The record in the instant case establishes to our satisfaction that the benefit of the surtax exemption did not produce the decision to create Esrenco. In the instant case, as in Hiawatha Home Builders, Inc., 36 T.C. 491, an accountant advised of the tax advantages to be gained by the formation of the new corporation. But we were persuaded in that case, as we are here, that the securing of a tax advantage was not the major purpose of the creation of the petitioner and *301 that the corporation would have been formed if no tax saving resulted. We decide this issue for the petitioners. We next direct our attention to respondent's alternative argument made under the provisions of section 482. [6] Respondent determined that the taxable income of Esrenco for the fiscal year ended July 31, 1958, constitutes income to Eastern. Respondent contends "that Eastern produced all the income of the rendering business, and the mere fact that Esrenco on its tax return reported part of such income and deducted expenses attributable to such income does not control." *302 Petitioner contends that respondent's alternative position has the effect of destroying the presumptive correctness of the respondent's determinations, and that in any event section 482 does not furnish authority for consolidating the taxable income of two corporations, citing Chelsea Products, Inc., 16 T.C. 840, affd., 197 F. 2d 620, and T.V.D. Co., 27 T.C. 879. There is no merit in the arguments advanced by petitioner on brief. In order to protect the revenue respondent may propose deficiencies against separate taxpayers for a single transaction on alternate theories. See Margaret W. Galbreath Hendrickson, 4 T.C. 231. In such case, as here, respondent must concede that only one of his determinations ultimately may be applicable. With respect to the scope of the respondent's authority under section 482, and its predecessor, section 45 of the Internal Revenue Code of 1939, we said in Ballentine Motor Co., Inc., 39 T.C. - (Nov. 6, 1962), on appeal (C.A. 4 and C.A. 5, Feb. 6, 1963): We believe that net income may in certain instances be properly allocated, under section 45 and currently section 482. If net *303 profits are shifted (one device at which the statute was specifically directed), it would be a logical short cut to allocate them instead of allocating "gross income, deductions, credits, [etc.]." The other devices of income shifting mentioned by the committee reports similarly suggest allocation of such income. The statute allows allocation of gross income and deductions, and to the extent this is permitted we believe it may be done as "net income." We do not construe Chelsea Products, Inc., or T.V.D. Co. to prevent this type of allocation. In Chelsea Products, Inc., and in T.V.D. Co., both supra, respondent's principal arguments were that the income was earned by sham corporations, and in each case this argument was rejected on the facts. [n10] Here he is contending that income was shifted to a valid and subsisting corporation but that the transfer was to evade taxes and resulted ina distrortion of income. [n11] [Footnotes omitted.] The issue therefore resolves itself into whether respondent properly determined that the taxable income of Esrenco in the amount of $29,618.21 for the taxable year ended July 31, 1958, constitutes income to Eastern within the provisions of section *304 482. Section 482 and its predecessor, section 45 of the Internal Revenue Code of 1939, have been interpreted to confer broad discretionary power upon the Commissioner to allocate income or deductions if he determines that such allocation is necessary in order to prevent evasion of taxes or clearly to reflect income. See National Securities Corporation v. Commissioner, 137 F. 2d 600, 602, affirming 46 B.T.A. 562, certiorari denied 320 U.S. 794. The congressional committee reports show that Congress intended the statute to prevent the evasion of taxes by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking." Ballentine Motor Co., Inc., supra; Seminole Flavor Co., 4 T.C. 1215, 1228. Respondent argues that Esrenco performed no bona fide separate business function. Respondent also questions the bona fides of the sales between Eastern and Esrenco. Section 1.482-1(b)(1), Income Tax Regs., states the scope and purpose of section 482 to be as follows: The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled *305 taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Thus, section 482 is based on the recognition of various corporate entities but allows the Commissioner to prevent distortions in income between *306 controlled corporations. See Chelsea Products, Inc., supra. In Seminole Flavor Co., supra, the petitioner manufactured flavor extracts. The advertising, sale, and supervision of the bottling of its products were taken over from petitioner by a partnership composed of petitioner's stockholders, whose interests in the partnership were identical with their stock interests in the petitioner. We held that section 45 of the Internal Revenue Code of 1939 had no applicability because the partnership was formed for valid business reasons, and operated as a separate entity. See also Buffalo Meter Co., 10 T.C. 83, 89, wherein it was said that "[the] important consideration is that the partnership was real for all purposes and that it has at all times functioned as an entirely separate economic entity." In the instant case Esrenco was formed for valid business reasons, which we discussed above with respect to the determinations made pursuant to sections 269 and 1551. Further, it has been established that Esrenco operated at all times as a separate economic entity. It actually bought and sold the goods it hauled, and its profits *307 were limited to the services it performed. It paid Eastern for its pro rata share of the cost of office space and secretarial and bookkeeping services. Esrenco also owned its own trucks, had its own employees, and kept separate books, bank accounts, and social security records. On the basis of the record before us we have found that: Esrenco's charges to Eastern for raw materials sold to it reflected a profit comparable to that which Esrenco would have earned as a contract-hauling company, and it also earned a similar price differential on finished goods purchased from Eastern and resold. Esrenco derived no profit from transactions in which it merely purchased and resold without actually hauling the goods purchased to the ultimate buyer. Both the rates charged for hauling and the prices paid for finished goods varied, the latter being governed by world-wide market conditions which subjected it to wide fluctuation. Therefore, this issue is governed by the principles applied in Seminole Flavor Co. and Buffalo Meter Co., both supra. There is no question but that the transactions between Eastern and Esrenco were fair and at arm's length. We therefore conclude that respondent exceeded *308 his authority by allocating Esrenco's taxable income for the fiscal year ended July 31, 1958, to Eastern. See Davis v. United States, 282 F. 2d 623; T.V.D. Co., supra. The next issue is whether or not certain payments made by Eastern to Pliescott as interest paid on an unsecured debenture were in reality a distribution of earnings and profits. Eastern was formed in 1952 and assets having a net value of $44,000 were transferred by Pliescott to the corporation in exchange for stock valued at $10,000 and 6 percent interest-bearing debentures in the face amount of $34,000. Respondent contends that at least $25,000 of the $34,000 face amount of the debenture represented equity capital and therefore interest payments on $25,000 on such indebtedness, which amounted to $1,500 in each of Eastern's fiscal years ended July 31, 1955, 1956, and 1957, should not be allowed as deductions. Petitioner contends that the debenture represents true indebtedness and therefore the interest paid is deductible. The ultimate question to be resolved is "whether the advances constituted as a matter of practical reality (i.e., 'for tax purposes') an equity investment in the business *309 of the corporation to which the advances were made, or a valid indebtedness within the meaning of the Internal Revenue Code." J. A. Maurer, Inc., 30 T.C. 1273, 1289-1290. There is no all-encompassing rule by which to measure the "realities" of the capital structure of a corporation. This Court has consistently adhered to the position that each case must be decided on the basis of its own facts and surrounding circumstances in determining "whether the real intention of the parties is consistent with the purport of the instruments." Gooding Amusement Co., 23 T.C. 408, 418, affd., 236 F. 2d 159. See also John Kelley Co. v. Commissioner, 326 U.S. 521; Tribune Publishing Co., 17 T.C. 1228; Toledo Blade Co., 11 T.C. 1079, affd., 180 F. 2d 357, certiorari denied 340 U.S. 811; Mullin Building Corporation, 9 T.C. 350, affd., 167 F. 2d 1001; Clyde Bacon, Inc., 4 T.C. 1107. Among the determinate factors are "the name given to the certificates evidencing the indebtedness, the presence or absence of a maturity date, the source of the payments, the right *310 to enforce the payment of principal and interest, participation in management, a status equal to or inferior to that of regular corporate creditors, the intent of the parties, capitalization, identity of interest between creditor and stockholder, and payment of interest only out of dividends." Wilbur Security Co., 31 T.C. 938, 948, affd., 279 F.2d 657. Turning to the debenture itself, there is contained therein a promise to pay a sum certain at a fixed date, "with interest thereon from the date hereof" at a fixed rate. The maker reserved an option to pay "all or any part of the principal indebtedness" any time after 5 years from the date of the instrument. Upon nonpayment of the obligation, the instrument authorized the entry of judgment "on this note for the amount thereof, including debt, interest, costs and ten per centum attorneys' fees for collection, without summons or process." Thus there is no question that the instrument contained the indicia of an indebtedness. Cf. Clyde Bacon, Inc., supra.Further, the instrument does not subordinate the obligation to the claims of the general creditors of the corporation, cf. *311 P. M. Finance Corporation v. Commissioner, 302 F. 2d 786, affirming a Memorandum Opinion of this Court, nor is there any evidence in the record of an understanding whereby the interest would be paid only out of earnings or that the principal may or may not be paid at maturity. Cf. Brake & Electric Sales Corporation v. United States, 287 F.2d 426. We are cognizant that purported loans to a corporation by a sole stockholder require close scrutiny. However, this circumstance is not in itself conclusive that the advances are capital contributions. Cf. Earle v. W. J. Jones & Son, 200 F. 2d 846; Maloney v. Spencer, 172 F. 2d 638. Respondent also points to the fact that Eastern began its corporate existence with a nominal amount of cash. However, the history of the business prior and subsequent to incorporation reveals a continuous financial growth. There is no evidence that Eastern's business was unstable or that its business prospects were such that the parties did not expect Eastern to meet its obligations as the bonds fell due. Cf. *312 Charter Wire, Inc. v. United States, 309 F. 2d 878 (C.A. 7, Nov. 28, 1962). Indeed, the contrary is true. The entire amount of the debenture was redeemed by the corporation prior to its maturity and prior to trial of this proceeding. There is nothing in the record to indicate that the debenture lacks "substantial economic reality." Cf. Nassau Lens Co. v. Commissioner, 308 F. 2d 39, remanding, 35 T.C. 268. On the basis of the entire record we find that there was no undercapitalization, and that the debenture was bona fide, was issued for money's worth and with the reasonable expectation that it would be repaid, was enforced according to its terms, was not subordinated to the claims of other creditors, and was intended to be what it purported to be in form. Therefore respondent improperly disallowed as deductions $1,500 of the interest payments in each of Eastern's fiscal years ended July 31, 1955, 1956, and 1957. The last question for our decision is whether an annual salary of $36,000 ($24,000 from Eastern and $12,000 from Esrenco) paid to petitioners' president constituted unreasonable compensation not within the provisions of section 162(a)(1) of the Internal Revenue Code *313 of 1954. [7] This is a factual question, the resolution of which involves a number of considerations, among them being the nature and extent of the services actually rendered by the employee and the results attributable thereto, the employee's earnings in past years when his duties and responsibilities were substantially the same, the amounts paid by comparable enterprises for identical services, and the employee's background, training, and suitability for the tasks performed. See Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115; Geiger & Peters, Inc., 27 T.C. 911; Christman Co., 8 T.C. 679, affd. on other issues, 166 F.2d 1016. It is sufficient to say that the application of the foregoing considerations to the facts of the instant case, without any need for elaboration, tend to support petitioners' contention that the compensation paid to Pliescott was reasonable. *314 On the other hand, certain factors which have been decisive in other cases support respondent, such as the facts that petitioners have never paid any dividends, there was no relationship between the compensation paid and petitioners' financial operations and conditions, and the compensation which respondent determined to be unreasonable was paid to the controlling or only stockholder. See Mayson Mfg. Co. v. Commissioner, supra; Concord Lumber Co., 18 T.C. 843. After carefully weighing all the pertinent factors, we are persuaded that petitioners have established that the compensation paid to Pliescott was reasonable. Pliescott has spent all of his adult life in this or a related business and he is as much a specialist or expert in his field as one could hope to become. His knowledge, ingenuity, and resourcefulness enabled him to expand what was essentially a scavenger operation into a thriving manufacturing company with annual sales close to a million dollars. He designed and built his plant, its layout, and a large part of its machinery so that only 5 men were required to operate it on a given shift. Respondent contends that the services rendered by Pliescott *315 in rebuilding his plant after the 1957 fire, even though they might arguendo justify the salary paid to him during and after that period, could not affect the amounts paid prior to the fire. But to so argue is to overlook the fact that the qualities demonstrated by Pliescott at that time were no less present although not as easily discernible before. Testimony by an officer of petitioners' competitor indicates that a similarly situated executive received a salary plus director's fees totaling almost $31,000 per annum. But this executive, unlike Pliescott, shared the duties and responsibilities of a similar business with several other top executives. Taking these foregoing factors into consideration, we are convinced and have found as a fact that Pliescott was well worth what he was paid. Decisions will be entered under Rule 50 in Docket Nos. 84146 and 84147. Decision will be entered for the petitioner in Docket No. 91169. Decision will be entered for the respondent in Docket No. 92765. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: The Eastern Shore Rendering Co., Docket No. 84147, and Esrenco Associates, Inc., Docket No. 92765.↩
2. Unless otherwise designated, all references to Code sections refer to the Internal Revenue Code of 1954.↩
3. SEC. 269. ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders, the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * *↩
4. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquisition, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $100,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b)↩, and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.
5. We question whether the sales of rendered products by Eastern to Esrenco constituted transfers of property within the intendment of section 1551↩. It seems to us that the statute means transfers of capital assets held as property by the transferor at or about the time of the incorporation or reactivation of the transferee corporation and not to periodic sales of manufactured products created long after the time of such incorporation or reactivation.
6. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
7. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩